**THIS IS NOT A SOLICITATION FOR ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL YET HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

**THE DEBTORS RESERVE THE RIGHT TO AMEND THIS DISCLOSURE STATEMENT AT ANY TIME PRIOR TO THE DISCLOSURE STATEMENT HEARING**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Jacksonville Division**

| | |
|---|---|
| In re: | CASE NO. 3:10-bk-00172-PMG |
| **BLACK CROW MEDIA GROUP, LLC, et al.,**[1] | CHAPTER 11 |
| Debtors. | Jointly Administered |

_____/

---

**DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION OF BLACK CROW AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

| **WILEY REIN LLP** | **LATHAM, SHUKER, EDEN & BEAUDINE, LLP** |
|---|---|
| H. Jason Gold | R. Scott Shuker |
| Valerie P. Morrison | Florida Bar No. 984469 |
| Dylan G. Trache | 390 N Orange Avenue, Suite 600 |
| 7925 Jones Branch Drive, Suite 6200 | Orlando, Florida 32801 |
| McLean, Virginia 22102 | Telephone: 407-481-5808 |
| Telephone: 703-905-2800 | Facsimile: 407-481-5801 |
| Facsimile: 703-905-2820 | |

Co-Counsel for the Debtors and Debtors in Possession

Dated: November 8, 2010

---

[1] The Debtors in these chapter 11 cases are: (i) Black Crow Media Group, LLC ("Black Crow Group"), (ii) Black Crow Media, L.L.C. ("Black Crow Media"), (iii) Black Crow Broadcasting, Inc. ("Black Crow Broadcasting"), (iv) Black Crow Radio, L.L.C. ("Black Crow Radio"), (v) Rocket City Broadcasting, LLC ("Rocket City"), (vi) BCA Radio, L.L.C. ("BCA Radio"), (vii) Black Crow Media of Valdosta, LLC ("Valdosta"), (viii) RTG Radio, L.L.C. ("RTG Radio"), (ix) Thomas Media Operations, L.L.C. ("Thomas Media"), (x) Thomas Radio, L.L.C. ("Thomas Radio"), (xi) Rainbow Media, Inc. ("Rainbow Media"), and (xii) Thomas Media, Inc. ("TMI").

# SUMMARY OF THE PLAN OF REORGANIZATION.

## A.    Introduction.

Black Crow Media Group, LLC and its debtor subsidiaries and affiliates (collectively the "Debtors" or "Black Crow") are soliciting votes from their Creditors for the acceptance of their Joint Plan of Reorganization of Black Crow and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code (the "Plan"). The Plan will permit Black Crow to continue in its business on a sound economic footing and will maximize recoveries for all Creditors by preserving the going concern value of Black Crow. Please refer to the attached Glossary for definitions of terms used in this Disclosure Statement.[2]

Under the Plan, Allowed Administrative and priority Claims are Unimpaired and will be satisfied in full. The acceptance of the Plan by Holders of these Claims is not required and Black Crow is not soliciting their votes.

Holders of Secured and General Unsecured Claims are impaired under the Plan and are entitled to vote. Black Crow is asking that all Holders of Secured and General Unsecured Claims vote to accept the Plan.

Under the Plan, Holders of Class 1 Allowed General Unsecured Claims of $1,000 or less, or who elect to reduce their Allowed General Unsecured Claims to $1,000, will receive payment in full, in Cash, without interest, on the Effective Date of the Plan.

Under the Plan, GE Capital will be entitled to elect between the following two alternative treatments on account of its Class 2 (Secured Claim) and Class 4 (Unsecured Deficiency Claim) if it votes to accept the Plan, either:

(a) Alternative A - a lump sum payment of $13,000,000 in full and final satisfaction of all Claims and Liens; or

(b) Alternative B (i) on account of its Class 2 Secured Claim, GE Capital will receive the Promissory Note in an amount equal to the value of its Prepetition Collateral, payable interest only at a fixed rate of 4% over a 10-year term, in monthly installments commencing 30 days after the Effective Date, plus 1% principal amortization paid annually, plus annual payments of a portion of Excess Net Cash Flow at the discretion of the Reorganized Debtor, commencing in 2012, with the balance due in full at the Maturity Date. The Promissory Note will be secured by a first priority Lien on the GE Capital Post-Effective Date Collateral; and (ii) on account of its Class 4 Unsecured Deficiency Claim, GE Capital will receive 20% of the net proceeds or value, as applicable, of Reorganized Black Crow in excess of the first Three Million Dollars ($3,000,000) of net proceeds or value, as applicable, upon the first to occur of a Liquidity Event or the Maturity Date.

If GE Capital rejects the Plan, GE Capital will receive the treatment provided in Alternative B on account of its Class 2 Secured Claim. If GE Capital rejects and is subordinated, it will receive no distribution under the Plan on account of its Class 4 GE Capital Deficiency Claim. If GE Capital rejects and is not equitably subordinated, GE Capital will share Pro Rata

---

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Plan.

with Class 8 Claimants in Class 8 Allocation on account of its Class 4 GE Capital Deficiency Claim.

The Plan provides that Allowed Class 3 Other Secured Claims will receive at the Reorganized Debtor's option: (i) deferred Cash payments equal to the present value of the collateral securing the Holder's Allowed Secured Claim, payable in monthly installments of principal and interest, with an amortization not to exceed five (5) years from the Effective Date; or (ii) monthly payments in the amounts set forth in their agreements with the Debtors, with an extension of the contract term to allow the Reorganized Debtor to satisfy any arrearages.

The Class 5 Claims of Wolfe and Wells are treated in the Plan as follows. Wolfe and Wells will be entitled to vote their Allowed Claims. If GE Capital accepts the Plan or its Claims are equitably subordinated, Wolfe and Wells will each receive deferred payments equal to 25% of their Allowed Claims, payable annually without interest, commencing on or about the first anniversary of the Effective Date. If GE Capital rejects the Plan and its Claims are not subordinated, Wolfe and Wells will receive no distribution on account of their Claims.

Under the Plan, Holders of Allowed Class 6 Barter Claims will receive advertisement airtime over a period of 18 months in full satisfaction of their Allowed Claims.

Under the Plan, Holders of Allowed Class 7 License Claims will receive Cash payments equal to 100 percent of their Allowed Claims, without interest, penalty or fees, payable as follows: 50% on the Effective Date, with the balance payable in one lump sum on the first anniversary of the Effective Date.

Under the Plan, Holders of Allowed Class 8 General Unsecured Claims are expected to receive payment in full from the Class 8 Allocation, without interest, in annual installments commencing on or about the first anniversary of the Effective Date of the Plan, over a period of five (5) years, subject to certain contingencies.

The Plan provides that the Class 9 Equity Interests in Black Crow Group will be cancelled and the Holders will not receive or retain any property on account of such Interests.

The Plan provides that the Class 10 Equity Interests in Operating Debtor Entities and Radio Debtor Entities will be cancelled and the Holders will not receive or retain any property on account of such Interests.

The Plan provides for the substantive consolidation of the Debtors and treats the Claims against each Debtor as Claims against all Debtors. However, the Debtors reserve the right to proceed with the Plan as though it provides individual Debtor sub-plans, in the event the Court denies substantive consolidation.

The following table explains the division of the Claims against and Equity Interests in the Debtors into Classes and summarizes the treatment for each Class. The table also identifies which Classes are entitled to vote on the Plan, based on rules set forth in the Bankruptcy Code. Finally, the table indicates an estimated recovery for each Class.

Unless otherwise specified, the information in the following table and in the sections below are based on calculations as of November 8, 2010. The estimate of recoveries makes the following assumptions:

- The Effective Date is assumed to occur by March 31, 2011.

- The estimated aggregate amount of Class 8 Allowed General Unsecured Claims against the Debtors is approximately $695,301.

- The GE Capital Secured Claim Promissory Note is for $15,620,000 (determined as follows: value of Prepetition Collateral [$17,500,000] less payments made to GE Capital for Cash and accounts receivable [$1,880,000])

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claim(s) | Estimated Recovery |
|---|---|---|---|---|---|
| **Unclassified Claims** | | | | | |
| | Administrative Expense Claims | Payment in full or as otherwise agreed. | No | Ordinary Course | 100% |
| | Professionals Claims | Payment in full or as otherwise agreed. | No | $1,133,000 | 100% |
| | Priority Tax Claims | Payment in full over five years from the Petition Date or as otherwise agreed. | No | $75,438 | 100% |
| | DIP Claims | Conversion to equity. | No | $1,200,000 | 100% |
| | Priority Non-Tax Claims | Payment in full. | No | $0 | 100% |
| | Intercompany Claims | No distribution | No | $1,974,041 | 0% |
| **Classified Claims** | | | | | |
| 1 | Convenience Class Claims | Full payment in Cash. | Yes | $21,771[3] | 100% |
| 2 | GE Capital Secured Claim | <u>Acceptance Alternative (A)</u> $13 Million Cash in full satisfaction of all Claims; or <u>Acceptance Alternative (B)</u> Promissory Note, with interest @ 4%, 10-year Maturity Date, 1% annual principal curtails, discretionary curtail from Excess Net Cash Flow, secured by GE Capital Post-Effective Date Collateral. <u>Rejection</u>: Same as Alternative B. | Yes | $15,620,000 | 100% |
| 3 | Other Secured Claims | Deferred Cash payments equal to value of collateral | Yes | $11,063 | 100% |

[3] This number does not reflect potential Claims held by General Unsecured Creditors who make the Convenience Class Election, as further discussed in section V.C.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claim(s) | Estimated Recovery |
|-------|-------------|-----------|------------------|------------------------------|--------------------|
| | | over 5 years or regular monthly contract payments, with term extended to cure arrears. | | | |
| 4 | GE Capital Deficiency Claim | If accepts and elects Alternative B, right to receive 20% of net proceeds/value of Reorganized Black Crow in excess of first $3,000,000, upon the first to occur of Liquidity Event or Maturity Date.<br>If rejects and Claims subordinated, no distribution.<br>If rejects and Claims not subordinated, Pro Rata share of Class 8 Allocation. | Yes | $20,659,314 | 0%-53.5% |
| 5 | Wolfe and Wells Claims | Deferred payments aggregating 25% of Allowed Claims without interest over 5 years from Effective Date, subject to contingencies. | Yes | $1,878,596 | 0% - 25% |
| 6 | Barter Claims | Payment in kind by performance of advertising spots over 18 months. | Yes | $355,527 | 100% |
| 7 | License Claims | Full payment without interest in two installments: 50% 30days after Effective Date; balance on first anniversary of Effective Date. | Yes | $771,640 | 100% |
| 8 | General Unsecured Claims | Deferred payment without interest over 5 years aggregating 100% of Allowed Claims, subject to contingencies. | Yes | $695,301 | 3%-100% |
| 9 | Equity Interests in Black Crow | Cancelled and No Distribution. | Yes | $0 | 0% |
| 10 | Equity Interests in Operating Debtors and Radio Debtors | Cancelled and No Distribution. | No | $0 | 0% |

**B.     Exit Capital Transaction.**

On the Effective Date, the New Equity Holder will make a capital contribution of $3 million, $1.8 Million of which will be in Cash and $1.2 million of which will be by conversion of the $1.2 million DIP Loan. The New Equity Holder will receive 100% of the New Membership Interests of Reorganized Black Crow in consideration of the New Capital Contribution and in full and final satisfaction of all obligations of the Debtors to the DIP Lender under the DIP Loan.

**C.     Voting on the Plan**

Holders of Secured and Unsecured Claims are impaired under the Plan and are entitled to vote.  Black Crow is asking that all Holders of Secured and Unsecured Claims vote to accept the Plan.  A copy of the Plan is attached as **Exhibit A** to this Disclosure Statement.

This Disclosure Statement provides the information needed to make an informed decision whether to accept or reject the Plan.  Not everyone is entitled to vote.  If you are entitled to vote, a ballot form will be included in this package.  If a Ballot is not included, you are not entitled to vote.  Please note that if there is any inconsistency between the Plan and the descriptions in the Disclosure Statement, the terms of the Plan will govern.  This Disclosure Statement and the Plan are the only materials Creditors should rely upon to determine whether to accept or reject the Plan.

> The *last day* to vote to accept or reject the Plan is
> _____.  To be counted, your Ballot must be actually
> *received* by the Balloting Agent by this date.
>
> The *record date* for determining which creditors may
> vote on the Plan is _____.
>
> **Recommendation:  The Debtors [and the Creditors
> Committee] urge Creditors to vote to accept the Plan.**

Copies of this Disclosure Statement are available upon request made to the Balloting Agent, at the following address:

| **Balloting Agent** |
| --- |
| Overnight or Hand Delivery:<br><br>EPIQ Bankruptcy Solutions, LLC<br>Attn:  Black Crow Media Group Ballot Processing Center<br>Processing Center<br>757 Third Avenue, 3rd Floor<br>New York, NY  10017<br><br>First Class Mail:<br><br>EPIQ Bankruptcy Solutions, LLC |

Attn: Black Crow Media Group, LLC
Ballot Processing Center
FDR Station PO Box 5014
New York, NY 10150-5014

Only actual votes will be counted. A failure to return a Ballot will not be counted either as a vote for or against the Plan. Any improperly completed or late Ballot will not be counted. Any Ballot that indicates both an acceptance and rejection of the Plan will be deemed a vote to accept the Plan. Notwithstanding the foregoing, if no votes to accept or reject the Plan are received with respect to a particular Class, the Class will be deemed to have voted to accept the Plan. If a Creditor casts more than one Ballot voting the same Claim or Equity Interest before the Voting Deadline, the latest dated Ballot received before the Voting Deadline will be deemed to reflect the voter's intent and thus to supersede any prior Ballots. Creditors must vote all of their Claims within a particular Class with respect to a particular Debtor under the Plan either to accept or reject the Plan and may not split their votes within a particular Class; thus, a Ballot (or a group of Ballots) within a particular Class of a particular Debtor received from a single Creditor that partially rejects and partially accepts the Plan will be deemed to have voted to accept the Plan.

**D.    Disclosure Statement Enclosures.**

Accompanying this Disclosure Statement are copies of: (i) the Plan (**Exhibit A**); (ii) Black Crow's liquidation analysis (**Exhibit B**); (iii) the Court's Order approving this Disclosure Statement (**Exhibit C**); (iv) the notice of the time for filing acceptances or rejections of the Plan, the date and time of hearing to consider confirmation of the Plan and for filing objections to confirmation of the Plan (**Exhibit D**); (v) financial projections (**Exhibit E**); and (vi) a corporate organizational chart for the Debtors (**Exhibit F**). In addition, those parties eligible to vote will receive a Ballot to vote on the Plan.

**E.    Disclaimer.**

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guaranty of the accuracy of the information contained herein or an endorsement of the Plan by the Bankruptcy Court. This Disclosure Statement, along with any letter from the Committee, is the only document authorized by the Bankruptcy Court to be used in connection with the solicitation of votes accepting the Plan. No representations other than those explicitly set forth in this Disclosure Statement are authorized concerning Black Crow, including the prospects of its reorganized business, the value of its assets, or the Claims of its Creditors. The information contained in the Disclosure Statement is for purposes of soliciting acceptances of the Plan.**

**This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents related to the Plan, certain events in the Case and certain financial information. Although Black Crow believes that the Disclosure Statement and related document summaries are fair and accurate, they are qualified to the extent that they do not set forth the entire text of the Plan, such documents or any statutory provisions. The terms of the Plan govern in the event of any inconsistency with this Disclosure Statement. All exhibits to the Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if set forth in full herein. The statements contained in the Disclosure Statement are made as of the date hereof, unless otherwise**

specified. Although Black Crow may subsequently update the information in this Disclosure Statement, Black Crow has no obligation to do so.

All forward-looking statements contained herein or otherwise made by Black Crow involve material risks and uncertainties and are subject to change based on numerous factors, including factors that are beyond Black Crow's control. Accordingly, Black Crow's future performance and financial results may differ materially from those expressed or implied in any such forward-looking statements. Such factors include, but are not limited to, those described in this Disclosure Statement. Black Crow does not undertake to publicly update or revise its forward-looking statements even if experience or future events make it clear that any projected results expressed or implied therein will not be realized.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with federal or state securities laws or other similar laws. The offer of New Membership Interests provided in the Plan has not been registered under the Securities Act of 1933, as amended, (the "Securities Act") or similar state securities or "blue sky" laws. The offers and issuances are being made in reliance on the exemption from registration specified in section 1145 of the Bankruptcy Code. None of the stock to be issued on the Effective Date has been approved or disapproved by the Securities and Exchange Commission or by any state securities commission or similar public, governmental, or regulatory authority, and neither the Securities and Exchange Commission nor any such state authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or upon the merits of the Plan.

Except as otherwise specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not necessarily been prepared in accordance with general accepted accounting principles.

All parties in interest are encouraged to read the entire Disclosure Statement carefully, including the Plan and other exhibits, before deciding to vote either to accept or reject the Plan. Holders of Claims should, however, not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice and should consult with their own advisors.

The Debtors are providing the information in this Disclosure Statement for the purpose of soliciting votes to accept the Plan. Nothing in this Disclosure Statement may be relied upon or used by any entity for any purpose other than to determine how to vote on the Plan.

The Debtors urge each Holder of a Claim or an Equity Interest to consult with its own advisors with respect to any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in the Disclosure Statement. The Debtors or the Reorganized Debtor may seek to investigate, file and prosecute Claims or Equity Interests and may object to Claims or Equity Interests after the Confirmation or Effective Date of the Plan irrespective of whether the Disclosure

Statement identifies any such Claims or Equity Interests or objections to Claims or Equity Interests in the Plan.

Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission. The Debtors' management has reviewed the financial information provided in this Disclosure Statement. The Debtors have used their reasonable business judgment to ensure the accuracy of this financial information. The financial information contained in, or incorporated by reference into, this Disclosure Statement has not been audited (unless expressly provided herein).

Holders of Claims and Equity Interests entitled to vote to accept or reject the Plan must rely on their own evaluation of the Debtors and their own analyses of the terms of the Plan in deciding whether to vote to accept or reject the Plan. Importantly, prior to deciding whether and how to vote on the Plan, each Holder of a Claim or an Equity Interest in a voting Class should review the Plan in its entirety and consider carefully all of the information in this Disclosure Statement and any exhibits hereto, including the risk factors described in greater detail in Section X.

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---:|
| I. | Introduction | 1 |
| | A. | Purpose of Plan | 1 |
| II. | Business Description and Reasons for Chapter 11 | 2 |
| | A. | Description of the Debtors' Businesses | 2 |
| | B. | Organization of the Debtors' Companies | 4 |
| | C. | Debtors' Pre-Petition Financing. | 5 |
| | D. | Events Leading to the Chapter 11 Filing | 6 |
| | E. | Pending Litigation and Other Legal Matters | 7 |
| III. | Significant Events During the Chapter 11 Cases | 7 |
| | A. | Filing and First Day Orders | 7 |
| | B. | Appointment of Committee | 8 |
| | C. | Postpetition Financing | 8 |
| | D. | Nonresidential Real Property Leases | 10 |
| | E. | Post-Petition Litigation | 10 |
| | | 1. GE Capital's Motions to Dismiss or Abstain and for Relief from the Automatic Stay | 10 |
| | | 2. GE Capital's Complaint to Determine Validity, Priority and Extent of Liens | 10 |
| | | 3. GE Capital's Complaint for Declaratory Judgment that the Estates Should not be Substantively Consolidated | 11 |
| | | 4. Debtors Valuation Motion | 11 |
| | | 5. Debtors' Equitable Subordination Complaint | 11 |
| | | 6. Mediation | 12 |
| | F. | Claims Process and Bar Date | 12 |
| | | 1. Schedules and Statements | 12 |
| | | 2. Bar Date for Filing Proofs of Claim | 12 |
| | | 3. Amendment to Schedules | 12 |
| | G. | Exclusivity | 12 |
| IV. | Pension Plan Issues | 13 |
| | | 1. Description of Pension Plans | 13 |
| | | 2. Status of Plan Contributions and Funding | 13 |
| V. | Treatment of Creditors and Shareholders Under the Plan | 13 |
| | A. | Substantive Consolidation | 13 |

B.    Summary of Classification and Treatment ........................................................ 13

    1.    Classification by Debtor ...................................................... 13

C.    Description of Classes for the Debtors ......................................... 14

D.    Unclassified Claims ......................................................................... 15

    1.    Administrative Expenses .................................................... 15

    2.    Priority Tax Claims ............................................................ 16

    3.    Debtor in Possession Financing .......................................... 16

    4.    Professionals Claims .......................................................... 16

    5.    Priority Non-Tax Claims .................................................... 17

    6.    Intercompany Claims ......................................................... 17

E.    Treatment of Classified Claims and Equity Interests ......................... 17

F.    Securities Law Matters .................................................................... 19

    1.    Issuance and Resale of New Securities Under the Plan ....... 19

G.    Reservation of "Cram Down" Rights ............................................. 19

VI.    Voting Procedures and Requirements .................................................... 19

A.    Vote Required for Acceptance by a Class ....................................... 20

B.    Classes Deemed to Accept or Reject .............................................. 20

C.    Voting ............................................................................................ 20

VII.    Financial Information, Projections and Valuation Analysis ........................... 21

A.    Projections ..................................................................................... 21

B.    Reorganization Valuation Analysis ................................................. 21

    1.    Scope of Valuation Performed .......................................... 21

    2.    Estimated Value ................................................................ 21

VIII.    Governance of Reorganized Debtor ....................................................... 22

A.    Boards of Directors ........................................................................ 22

B.    Senior Management ........................................................................ 22

C.    Corporate Governance .................................................................... 22

IX.    Other Aspects of the Plan ..................................................................... 22

A.    Distributions .................................................................................. 22

    1.    Distribution Through Agents ............................................. 22

    2.    Timing and Conditions of Distributions ............................ 22

        a.    Date of Distributions .............................................. 22

|  |  |  | b. | Timing of Distributions | 23 |
|  |  |  | c. | Post-petition Interest | 23 |
|  |  | 3. | | Distribution Reserve | 23 |
|  |  | 4. | | Record Date for Distributions | 24 |
|  | B. | | | Delivery of Distributions | 24 |
|  |  | 1. | | General | 24 |
|  |  | 2. | | Minimum Distributions | 24 |
|  |  | 3. | | Undeliverable Distributions and Unclaimed Property | 24 |
|  |  |  | a. | Undeliverable Distributions | 24 |
|  |  |  | b. | Unclaimed Distributions | 24 |
|  |  | 4. | | Procedures for Treating Disputed Claims under the Plan | 25 |
|  |  |  | a. | Disputed Claims | 25 |
|  |  |  | b. | Objections to Claims | 25 |
|  | C. | | | Treatment of Executory Contracts and Unexpired Leases | 25 |
|  |  | 1. | | Contracts and Leases Not Expressly Assumed are Rejected | 25 |
|  |  | 2. | | Employee-Related Agreements | 26 |
|  |  | 3. | | Cure of Defaults | 26 |
|  |  | 4. | | Rejection Claims | 26 |
|  | D. | | | Effect of Confirmation | 26 |
|  |  | 1. | | Discharge of Claims against the Debtors and Termination of Equity Interests in Thomas Media, Black Crow Broadcasting, Black Crow Group, Operating Debtors and Radio Debtors | 26 |
|  |  | 2. | | Indemnification | 27 |
|  |  | 3. | | Exculpation | 27 |
|  | E. | | | Releases | 27 |
|  | F. | | | Management Equity Plan | 28 |
| X. | | | | Certain Factors To Be Considered | 28 |
|  | A. | | | Certain Bankruptcy Considerations | 28 |
|  | B. | | | Risks Relating to Projections | 29 |
|  | C. | | | Risks Associated with Unavailability of Credit | 29 |
|  | D. | | | Risks Associated with the Businesses and the Radio Industry | 29 |
|  |  | 1. | | The Media Industry is Intensely Competitive | 29 |
|  |  | 2. | | Decline in Advertising Sales/Revenue | 30 |

3. Geography is a Risk Factor ................................................................. 30

E. Other Risk Factors ................................................................................ 30

1. Approval of the Black Crow Plan of Reorganization ........................... 30

2. The Debtors' Income Tax Assets may not be Realizable..................... 30

3. Valuation may not be Adopted by the Bankruptcy Court ................... 31

4. Loss of Key Personnel........................................................................ 31

5. Radio Broadcast Licenses and the Debtors' Relationship with the FCC .................................................................................................... 31

XI. Confirmation Hearing................................................................................. 32

XII. General Requirements of Section 1129 ........................................................ 32

A. Best Interests Tests .............................................................................. 34

B. Feasibility ............................................................................................ 34

C. Section 1129(b) .................................................................................... 34

1. No Unfair Discrimination.................................................................. 34

2. Fair and Equitable Test..................................................................... 34

XIII. Certain U.S. Federal Income Tax Consequences of the Plan ......................... 35

A. Tax Consequences to the Debtors ......................................................... 36

1. Discussion of Cancellation of Debt Rules on Debtors. ...................... 36

a. Single Member LLC's (Black Crow Media, LLC; Black Crow Radio, LLC; Rocket City Broadcasting, LLC; BCA Radio, LLC; RTG Radio, LLC; Thomas Radio, LLC) which are ignored for tax purposes ................................... 36

b. LLC's which are taxed as partnerships (Black Crow Media Group, LLC; Black Crow Media of Valdosta, LLC; Thomas Media Operations, LLC) ................................... 36

c. Sub Chapter S Corporations (Black Crow Broadcasting, Inc.) which are taxed similarly to partnerships with some distinctions .................................................................... 36

d. Sub Chapter C Corporations (Thomas Media, Inc.; Rainbow Media, Inc.) ................................................................ 36

2. Alternative Minimum Tax ................................................................. 37

3. Accrued Interest................................................................................ 37

B. Tax Consequences to Creditors ............................................................ 37

C. Information Reporting and Withholding ............................................... 38

XIV. Government Regulation............................................................................... 39

# TABLE OF CONTENTS
(continued)

Page

XV. Conclusion ..................................................................................................... 40

GLOSSARY .......................................................................................................... 43

EXHIBIT A

EXHIBIT B

EXHIBIT C

EXHIBIT D

EXHIBIT E

EXHIBIT F

In re:                                          CASE NO. 3:10-bk-00172-PMG

**BLACK CROW MEDIA**                            CHAPTER 11
**GROUP, LLC, *et al.*,**[4]

                    **Debtors.**                Jointly Administered
_____/

---

**DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION OF
BLACK CROW AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE
BANKRUPTCY CODE**

---

## I.     Introduction.

### A.     Purpose of Plan.

This Disclosure Statement sets forth certain information regarding the Debtors' pre-petition history, significant events that have occurred during the Chapter 11 Cases and the reorganization and anticipated post-reorganization operations and financing of the Reorganized Debtor. This Disclosure Statement also describes the terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims eligible to vote must follow for their votes to be counted.

The Debtors are reorganizing pursuant to Chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. As a result, the Confirmation of the Plan means that the Reorganized Debtor will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business. Additionally, as discussed in greater detail in Section IX.D. herein, a bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such person voted on the plan or affirmatively voted to reject the plan.

---

[4] The Debtors in these chapter 11 cases are: (i) Black Crow Media Group, LLC ("Black Crow Group"), (ii) Black Crow Media, L.L.C. ("Black Crow Media"), (iii) Black Crow Broadcasting, Inc. ("Black Crow Broadcasting"), (iv) Black Crow Radio, L.L.C. ("Black Crow Radio"), (v) Rocket City Broadcasting, LLC ("Rocket City"), (vi) BCA Radio, L.L.C. ("BCA Radio"), (vii) Black Crow Media of Valdosta, LLC ("Valdosta"), (viii) RTG Radio, L.L.C. ("RTG Radio"), (ix) Thomas Media Operations, L.L.C. ("Thomas Media"), (x) Thomas Radio, L.L.C. ("Thomas Radio"), (xi) Rainbow Media, Inc. ("Rainbow Media"), and (xii) Thomas Media, Inc. ("TMI").

For a summary of the Plan, please see Section V hereof.  For a discussion of certain factors to be considered prior to voting, please see Section X hereof.

**II.    Business Description and Reasons for Chapter 11.**

**A.    Description of the Debtors' Businesses.**

The Debtors hold the FCC licenses for and operate 22 radio stations in five geographically distinct markets in Florida, Alabama, Georgia and Tennessee.  The radio stations are:

| Black Crow Stations | | | |
|---|---|---|---|
| **Call Signs** | **Community of License** | **Licensee** | **Market** |
| WHOG-FM | Ormond-by-the-Sea, Florida | Black Crow Radio | Daytona Beach, Florida |
| WVYB-FM | Holly Hill, Florida | | |
| WKRO-FM | Edgewater, Florida | | |
| WNDB-AM | Daytona Beach, Florida | | |
| | | | |
| WAHR-FM | Huntsville, Alabama | BCA Radio | Huntsville, Alabama |
| WRTT-FM | Huntsville, Alabama | | |
| WLOR-AM | Huntsville, Alabama | | |
| | | | |
| WQPW-FM | Valdosta, Georgia | RTG Radio | Valdosta, Georgia |
| WVGA-FM | Lakeland, Georgia | | |
| WWRQ-FM | Valdosta, Georgia | | |
| WVLD-AM | Valdosta, Georgia | | |
| WSTI-FM | Quitman, Georgia | | |
| WKAA-FM | Willacoochee, Georgia | | |
| WXHT-FM | Madison, Florida | | |
| | | | |
| WCJX-FM | Five Points, Florida | RTG Radio | Lake City, Florida |
| WQHL-FM | Like Oak, Florida | | Live Oak, Florida |
| WQHL-AM | Live Oak, Florida | | Live Oak, Florida |
| | | | |
| WFKX-FM | Henderson, Tennessee | Thomas Radio | Jackson, Tennessee |
| WHHM-FM | Henderson, Tennessee | | |
| WZDQ-FM | Humboldt, Tennessee | | |
| WJAK-AM | Jackson, Tennessee | | |
| | | | |
| WWYN-FM | McKenzie, Tennessee | Rainbow Media | Jackson, Tennessee |

Under the Communications Act of 1934, as amended  ("Communications Act"), a license from the Federal Communications Commission is required for a person to engage in radio broadcasting.  In the case of Black Crow, the subsidiaries with the word "Radio" in the names (i.e., Black Crow Radio, BCA Radio, RTG Radio and Thomas Radio), together with Rainbow Media, are the holders of the FCC Licenses for the respective stations in each of their respective markets.

Every commercial radio broadcast station is licensed to provide service to a particular community. Radio broadcast stations are subject to an array of public interest obligations. Chief among them are the dual requirements of affirmatively identifying issues of local interest and concern and providing programming that addresses those issues. Radio broadcast stations, which can be seen as filling a similar role to that traditionally held by local newspapers, therefore play a critical role in the lives of local communities. Accordingly, the FCC's licensing and ownership policies tend to encourage operators with strong local and regional ties, as is evidenced by the FCC's recent Localism, Diversity, and Rural Radio proceedings. Black Crow is such an operator and is serious about its responsibility to provide valuable service to the communities that its stations serve.

The Debtors' 22 radio stations provide listeners with numerous types of programming from locally originated content with local personalities to syndicated programming with national personalities. Formats cover all types of music, including: Country, Rock, Urban, Contemporary and Oldies, and all stations cover local news, weather and sports programming on a 24 hour, 7 day a week basis. Overall, the Debtors' stations are diversified in terms of format and target audience, in order to reach the broadest listener base in each market.

The Debtors' radio stations provide a unique and vital service to the local communities in which they operate. The Debtors believe that community service is at the heart of a successful broadcast operation and have operated their stations with that mission since their inception. On average, approximately 90% of the Debtors' revenue is derived from the local marketplaces in which the stations serve, making the personal connection between listeners, advertisers and the stations critical to their success.

In particular, since their inception in 1994, the Debtors' radio stations have played a critical part in the dissemination of information to the citizens in their communities during times of hardship. For example, when the Daytona Beach area was hit by a devastating wildfire that raged out of control for 30 days and forced the evacuation of nearly one third of the city in 1998, the Debtors' engineers worked to wire the three FM stations to broadcast out of the AM studio, effectively creating a four station simulcast, dubbed "The Black Crow Radio Network (BCRN)." As citizens' cell phones overloaded with traffic and power outages spread, BCRN was the only media outlet to air continuous up-to-the-minute coverage of fire locations, open shelters, street closings, power outages, school and business closings and all of their re-openings. The Debtors directed citizens to open gas stations, stores with ice, places that still had generators, chain saws and shovels for sale, and provided a forum for local residents to call in with their stories and observations. Moreover, BCRN served as a clearing house for county requests for everything from bottled water to shoelaces to accommodations for the men fighting the fires. The Debtors received numerous commendations for these efforts.

The establishment of BCRN in 1998 became a blueprint for the Debtors' stations to respond to their communities in time of need. Since then, the Debtors have activated the network in response to hurricanes Floyd and Irene in 1999, hurricanes Charley, Frances and Ivan in 2004; a class IV tornado that devastated the Jackson, TN market in February of 2003; and the nationally declared flood disasters which occurred in April and May, 2009 in Valdosta, GA and Daytona Beach, FL respectively. The network has also been activated many more times in response to less severe events and in anticipation of severe events which threatened to cause serious damage to our communities. Black Crow's clusters in Daytona Beach, Valdosta and Jackson carry the official Emergency Information Outlet designations in their counties. In Daytona one county has gone as far as to add "For emergency information tune to [Black Crow Radio] 95.7" to their

emergency evacuation road signs. The Debtors' efforts far exceed the minimal requirements of the FCC to air emergency information through its Emergency Alert System (EAS) program.

The Debtors' dedication to its local communities further manifests itself in their commitment to charity and community outreach programs. The Debtors pride themselves on raising more money than most of their competitors combined for charities that are focused on the needs of local markets. The Debtors' radio stations put on over 100 local community events annually – most of which are free to the public – ranging from holiday celebrations, to concerts, to job fairs and the like.

**B.      Organization of the Debtors' Companies.**

Black Crow Group is a limited liability company organized in Delaware. Its members include nondebtors Black Crow Radio Partners, L.L.C. ("Radio Partners"), a Florida limited liability company and J. Michael Linn Revocable Trust, and Debtors TMI, a Tennessee corporation, and Black Crow Broadcasting, a Florida corporation. Black Crow Group holds the controlling membership interests in the following four operating subsidiaries: Black Crow Media, a Florida limited liability company; Rocket City, a Florida limited liability company; Valdosta, a Florida limited liability company; and Thomas Media, a Florida limited liability company. These companies are headquartered in leased facilities on West International Speedway Boulevard in Daytona Beach, Florida.

The operating subsidiaries, in turn, own the membership interests in the subsidiaries that hold the FCC licenses. Thus, Black Crow Media is the sole and Managing Member of Black Crow Radio, a Florida limited liability company, which owns and operates four radio stations in the Daytona Beach, Florida market, as follows: WHOG-FM, licensed to Ormond-by-the-Sea, Florida; WVYB-FM, licensed to Holly Hill, Florida; WKRO–FM, licensed to Edgewater, Florida; and WNDB-AM, licensed to Daytona Beach, Florida. Black Crow Radio operates out of the companies' leased facilities on West International Speedway Boulevard in Daytona Beach, Florida.

Rocket City is the sole and managing member of BCA Radio, a Florida limited liability company which owns and operates three radio stations in the Huntsville, Alabama market, as follows: WAHR-FM, WRTT-FM, and WLOR-AM, each licensed to Huntsville, Alabama. BCA Radio operates out of a leased facility on The Boardwalk in Huntsville, Alabama.

Valdosta is the sole and managing member of RTG Radio, a Florida limited liability company, which owns and operates seven radio stations in the Valdosta, Georgia market and three radio stations in the Lake City/Live Oak, Florida market, as follows: WQPW-FM, licensed to Valdosta, Georgia; WVGA-FM, licensed to Lakeland, Georgia; WWRQ-FM, licensed to Valdosta, Georgia; WVLD-AM, licensed to Valdosta, Georgia; WSTI-FM, licensed to Quitman, Georgia; WKAA-FM, licensed to Willacoochee, Georgia; WXHT-FM, licensed to Madison, Florida; WCJX-FM, licensed to Five Points, Florida; WQHL-FM, licensed to Live Oak, Florida; and WQHL-AM, licensed to Live Oak, Florida. RTG Radio operates out of leased facilities on Ellis Drive in Valdosta, Georgia. Additionally, the Live Oak stations operate out of owned facilities on Helvenston Street in Live Oak, Florida, and the Lake City station operates out of an owned facility on US Highway 41 in Lake City, Florida.

Thomas Media is the sole and managing member of Thomas Radio, a Florida limited liability company which owns and operates four radio stations in the Jackson, Tennessee market, as follows: WFKX-FM, licensed to Henderson, Tennessee; WHHM-FM, licensed to Henderson,

Tennessee; WZDQ-FM, licensed to Humboldt, Tennessee; and WJAK-AM, licensed to Jackson, Tennessee. Thomas Radio operates out of a leased facility on Main Street in Jackson, Tennessee.

Thomas Radio is also the sole and managing member of Rainbow Media, a Tennessee corporation which owns and operates WWYN-FM, licensed to McKenzie, Tennessee. Rainbow Media operates out of the leased Jackson, Tennessee studios.

Black Crow Group is an affiliate of several nondebtor entities. An organizational chart of debtor and nondebtor affiliates is attached hereto as **Exhibit F.**

### C.    Debtors' Pre-Petition Financing.

To finance their expansion and acquisitions over the past 15 years, the Debtors initially borrowed funds from two regional banks, Colonial Bank (which was subsequently acquired by BB&T) and SouthTrust (subsequently acquired by Wachovia, which was subsequently acquired by Wells Fargo). In November 2001, the various entities restructured and refinanced their obligations with Goldman Sachs for $46,250,000 under a new entity, Black Crow Media Group, LLC, a Florida limited liability company. In conjunction with the restructuring, Black Crow Broadcasting, TMI, and Radio Partners, L.L.C. assigned their interests in their respective radio stations to Black Crow Group's direct subsidiaries, Black Crow Media, Rocket City, Valdosta and Thomas Media. The FCC licenses were transferred to these entities' respective subsidiaries, Black Crow Radio, BCA Radio, RTG Radio, Thomas Radio and Rainbow Media.

On October 3, 2003, the Black Crow companies refinanced their operations with GE Capital and Spectrum. At the request of Spectrum, Black Crow Group was also re-formed at that time as a Delaware limited liability company to hold controlling interests in the Black Crow Group subsidiaries. GE Capital provided a $48 million dollar term and revolving credit facility secured by a first priority lien upon all or substantially all of the assets of the Debtors. In conjunction with their financing agreements with GE Capital, the Debtors, GE Capital and two depository institutions where the Debtors maintain their operating accounts executed control agreements in favor of GE Capital ("Blocked Accounts").

As of the petition date, the outstanding principal balance owed to GE Capital was approximately $38,886,250.

Spectrum initially invested $35 million in exchange for subordinated notes bearing interest at 18.25% per annum paid in kind and warrants to acquire 33.35 common units of Black Crow Group. The proceeds of $40.5 million drawn from GE Capital and $35 million from Spectrum were used to repay Goldman Sachs, fund the buy out of certain stockholders, and pay various legal and administrative expenses related to the transaction. In June 2004, the Debtors borrowed additional funds from GE Capital under the revolving facility and acquired an additional equity infusion of $1.6 million from Spectrum in exchange for warrants to acquire an additional 1.802 common units in Black Crow Group to finance Valdosta's acquisition of two additional radio stations. At the conclusion of this transaction, Spectrum's aggregate investment in Black Crow Group was $36,600,000 and it held 35.152 warrants to acquire common units of Black Crow Group.

By December 2006, with the accrual of paid-in-kind interest, the total amount due Spectrum under the notes was $61,000,000. On December 29, 2006, the Debtors restructured their obligations to Spectrum by distributing $9,750,000 to Spectrum and approximately $1,000,000 to other Black Crow Group equity holders, reducing the principal balance on the

notes to $51,250,000 and converting the notes into nonvoting preferred membership units and warrants for an additional 231.45 common units. At the conclusion of this transaction, Spectrum held 61 preferred units, warrants for a total of 266.6 common units, which, if exercised, would result in Spectrum holding 80% of the common equity of Black Crow Group. Under its agreements with the Debtors, Spectrum had the right under certain circumstances to require Black Crow Group to redeem its preferred units and to honor a put that would obligate Black Crow Group to purchase its warrants (or its common units, if the warrants have been exercised), thereby requiring Black Crow Group to purchase for cash the warrants and preferred units at a value calculated under the applicable agreements. The Debtors' agreements with Spectrum grant it the right to require a redemption and put by Black Crow upon notice after the expiration of a stated term or in connection with a sale, change of control or liquidation event of Black Crow Group.

To aggregate the necessary funds for the Spectrum restructure, the Debtors sold 5 of Valdosta's radio stations and 14 radio towers, borrowed $3.7 million under its credit facility with GE Capital and used approximately $1 million of company cash.

In May 2006, GE Capital required an amendment to its credit agreement with the Debtors obligating the Debtors to enter into an interest rate hedge agreement with HSBC. In December 2007, a new swap was put in place for a notional amount of $35 million at 4.25% per annum with a 24-month maturity.

**D.      Events Leading to the Chapter 11 Filing.**

As with other radio broadcasters, Black Crow's chief source of revenue is advertising. Across the radio broadcasting industry, local and national radio advertising revenues began to falter in 2007, falling by 3% compared to 2006. Advertising revenues continued to fall another 10% in 2008, and were down another 20% in 2009. Black Crow suffered a decline of approximately 23% in gross revenues from December 2008 to December 2009, consistent with the decline in general radio industry revenues.

Due to the rapid decline in advertising revenue of the Debtors, and adjustments to certain leverage and interest rate ratio calculations in their credit agreements with GE Capital, the Debtors were not able to satisfy their leverage coverage and interest coverage ratios under their credit agreements at the end of the fourth quarter of 2007.

The covenants in the GE Capital credit agreement continued to adjust downward throughout 2008 and 2009, so that to become compliant, Black Crow would have had to increase revenues and profits in a declining economy that by the Fall of 2008 ended up in recession.

During this time frame, the HSBC interest rate swap began to produce a significant drain on the Debtors' cash. Had interest rates remained steady or increased over the swap rate of 4.25%, the arrangement would have at least been neutral and could have been potentially profitable. However, since 2008, interest rates had fallen far below 4.25%, and as a direct result, the Debtors had to spend in excess of $1 million in additional interest in 2009.

In addition, in October, 2008, GE Capital instituted a default interest rate of 2% at a cost to the Debtor of approximately $800,000 annually, paid monthly, which further depleted the Debtors' already weakened cash position. As of December 31, 2008, Black Crow notified GE Capital that it could not make the required principal payment under its loan documents. Black Crow continued to make regular interest payments through May 2009 and made its default interest payments through February 2009.

The combination of decreased revenues and increased interest obligations created a severe liquidity crisis for the Debtors. The Debtors looked to cut costs wherever possible -- including senior management compensation, on air talent, research, sales commissions and a host of other expenses -- in order to be able to continue to meet their debt service and operating obligations.

The Debtors attempted pre-petition to restructure their obligations with GE Capital and explored strategic alternatives with potential investors over the 24 months preceding the Petition Date. Although the Debtors had engaged in lengthy discussions with GE Capital and Spectrum in an effort to formulate a restructure of the companies, the parties were unable to formulate a plan acceptable to all parties. The failure of the parties to reach agreement, combined with the continued decline in the overall economy, and the radio advertising market in particular, further exacerbated the Debtors' liquidity problems.

On or about January 4, 2010, GE Capital issued notices of exclusive control over the Blocked Accounts and seized the funds therein aggregating approximately $725,000. On the same day, GE Capital filed a complaint in the United States District Court for the Southern District of New York seeking the appointment of a receiver ("Receivership Action"). A hearing was set on GE Capital's request for the appointment of a receiver for January 14, 2010, and Black Crow's response was due two days earlier, on January 12, 2010. Notwithstanding continued active efforts on the part of Black Crow to reach a deal with GE Capital to avoid the need for a bankruptcy filing, no agreement was reached and GE Capital refused to put the Receivership proceeding on hold to permit these discussions to be completed. As a consequence of GE Capital's actions, the Debtors filed for chapter 11 relief on January 12, 2010 in order to preserve their assets and restructure their business.

**E.      Pending Litigation and Other Legal Matters.**

GE Capital's receivership lawsuit has been stayed as a result of these Bankruptcy Cases, although the parties have provided regular updates to the U.S. District Court Judge presiding over the receivership case regarding the status of the Chapter 11 Cases. There was no other litigation pending as of the Petition Date.

**III.     Significant Events During the Chapter 11 Cases.**

**A.      Filing and First Day Orders.**

On January 12, 2010, Black Crow Media Group and eleven (11) of its subsidiaries and affiliates filed their respective petitions under Chapter 11 of the Bankruptcy Code. Shortly following the filing of the bankruptcy petitions, the Debtors filed several motions seeking expedited relief in this Court. These motions included, (a) the Motion for Joint Administration; (b) the Emergency Motion to Use Cash Collateral of GE Capital ("Cash Collateral Motion"); (c) the Emergency Motion to Authorize Compensation of Officers and Insiders; (d) the Emergency Motion to Authorize the Debtors to Pay Pre-petition Wages, Salaries, Commissions and Benefits and Direct All Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Wage, Salary and Benefit Obligations; (e) the Emergency Motion for Entry of Case Management Order Establishing (i) Limited Notice Procedures, (ii) Omnibus Hearing Dates, and (iii) Procedures for Scheduling Hearings; (f) the Emergency Motion for Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services; and (g) the Emergency Motion for Order Pursuant to 11 U.S.C § 105(a), 345(b) and 363 Authorizing (i) the Maintenance of Bank

Accounts and the Continued Use of Existing Business Forms; and (ii) the Maintenance of the Debtors' Existing Cash Management System (collectively, the "First Day Motions").

On January 15, 2010, the Court held interim hearings with respect to the First Day Motions. GE Capital filed an objection to the Cash Collateral Motion. This Objection was resolved, and the Court entered Orders granting the First Day Motions shortly following the hearing.

**B.      Appointment of Committee.**

On February 16, 2010, the United States Trustee for the Middle District of Florida, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed a statutory committee of creditors (the "Committee") in the Debtors' Chapter 11 Cases.

The Committee consists of the following three members: Wolfe Communications, Inc., the Estate of Frederic E. Wells, deceased, and EME Communications.

The Committee retained the following advisors: Brian Rich and Douglas Bates of Berger Singerman as counsel, and Focus Management Group as financial advisors.

**C.      Postpetition Financing.**

1.      DIP Credit Facility Agreement.

The DIP Credit Facility Agreement is the senior secured debtor in possession credit agreement, dated as of January 15, 2010, among Black Crow, as Borrower, and Paul C. Stone, as Lender (the "DIP Lender"). The Debtors entered into the DIP Credit Facility Agreement to insure sufficient liquidity to fund the expenses associated with their Chapter 11 Cases.

Under the DIP Credit Facility Agreement, the DIP Lender agreed to provide a revolving credit facility of up to $1,500,000 to fund working capital requirements during the Chapter 11 Cases.

Claims of the DIP Lender against the Debtors are accorded superpriority administrative expense status in each of the Debtors' Chapter 11 Cases. That is, they are to be paid before any other obligations of the Debtors, including administrative expenses and other Claims entitled to priority under the Bankruptcy Code.

The DIP Credit Facility closed on June 16, 2010. As of the date of this Disclosure Statement, $1.2 million has been drawn and remains outstanding under the DIP Credit Facility Agreement. The proceeds of the DIP Loan, together with the Debtors' Cash, were used by Black Crow to pay $1.88 million owed to GE Capital under the GE Capital Credit Facility, in satisfaction of its security interest in the Debtors' Cash and accounts receivable.[5]

Borrowings under the DIP Credit Facility Agreement bear interest at 12% per annum, payable monthly in arrears, and are evidenced by a revolving note. Default interest is an additional 2% per annum.

---

[5] GE Capital asserts, and the Debtors dispute, that certain additional assets constitute its cash collateral. This dispute is the subject of an adversary proceeding described in Section D below.

The DIP Credit Facility Agreement is secured by first priority liens on the Debtors' Cash and accounts receivable generated on and after the closing date. As a result of the payment to GE Capital of $1.88 million on June 16, 2010, GE Capital's security interest in the Debtors' Cash and accounts receivable was satisfied in full and discharged.

The DIP Credit Facility Agreement provides a carve out from liens and superpriority Claims granted in the DIP Credit Facility Agreement in the event of the occurrence and during the continuance of an Event of Default for (i) the payment of allowed professional fees and disbursements incurred by the professionals retained by the Debtors and the Committee and (ii) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the clerk of the Bankruptcy Court, in the aggregate amount not to exceed $100,000.

2.    DIP Loan Proceedings.

On January 21, 2010, the Debtors filed their Motion (i) for Authorization to Obtain Post-Petition Secured Financing and (ii) for Authority to Use Cash Collateral (Docket No. 44) (the "DIP Motion"). On February 4, 2010, GE Capital filed an objection to the Debtors' DIP Motion arguing that (i) the DIP Loan was an impermissible "priming" loan; (ii) that the Debtors failed to provide GE Capital with adequate protection for any diminution in its collateral position; and (iii) that the DIP Loan was not necessary. On February 18, 2010, the Court held a preliminary hearing on the DIP Motion and scheduled a final hearing to be held on March 19, 2010 contemporaneously with GE Capital's Motion for Relief from the Automatic Stay and Motion for Dismissal or Abstention. On March 17, 2010, GE Capital filed a Supplemental Objection to the DIP Motion arguing that the DIP Loan should not be approved because it had not been appropriately "shopped."

On March 19, 2010, the Court held an evidentiary hearing on the DIP Motion and several other matters. Following the hearing, the Court took all matters under advisement. On April 5, 2010, the Court orally granted the DIP Motion. GE Capital and the Debtors were unable to agree upon the form of order with respect to the DIP Motion. Accordingly, the parties submitted competing orders with respect to the DIP Motion, and on April 27, 2010, the Court held a further hearing to consider the competing orders. On May 3, 2010, the Court entered its Final Order Authorizing Debtors-in-Possession to Obtain Postpetition Secured Financing, and Authorizing Use of Cash Collateral of DIP Lender ("Original DIP Order").

On May 10, 2010, the Debtors filed their Emergency Motion for Clarification of the Original DIP Order ("Motion for Clarification"). Through the Motion for Clarification, the Debtors sought certain revisions to the Original DIP Order to comport with the Bankruptcy Court's oral ruling of April 5, 2010, the DIP Credit Agreement, and the Proposed Order which originally accompanied the DIP Motion. On May 18, 2010, the Court held an expedited hearing on the Motion for Clarification and agreed to enter an amended order incorporating most of the revisions requested by the Debtors, but at the request of GE Capital, continued the hearing to May 26, 2010 for further consideration. On May 26, 2010, the Court held a further hearing with respect to the Motion for Clarification. On May 28, 2010, the Bankruptcy Court entered the Amended Final Order Authorizing Debtors-in-Possession to Obtain Postpetition Secured Financing, and Authorizing the Use of Cash Collateral of DIP Lender ("DIP Order"). The DIP Order provided for a temporary stay of its effectiveness through June 11, 2010.

On June 3, 2010, GE Capital filed a Notice of Appeal with respect to the DIP Order and an Emergency Motion to Stay Pending Appeal of the DIP Order with the Bankruptcy Court. On June 6, 2010, the Debtors filed their Opposition to GE Capital's Motion for Stay Pending Appeal.

On June 7, 2010, the Court heard argument with respect to GE Capital's Stay Motion and denied that motion by the Order Denying Stay Pending Appeal entered on June 8, 2010. On June 8, 2010, GE Capital filed its Emergency Motion for Stay Pending Appeal ("District Court Stay Motion") in the District Court. On June 10, 2010, the Debtors filed their opposition to the District Court Stay Motion. On June 11, 2010, the District Court held a hearing to consider the District Court Stay Motion. By Order entered on June 14, 2010, the District Court denied the District Court Stay Motion. GE Capital's appeal was dismissed on July 7, 2010.

The Debtors and the DIP Lender closed under the DIP Credit Facility Agreement on June 16, 2010. The current balance outstanding under the DIP Credit Facility is $1.2 Million.

### D. Nonresidential Real Property Leases.

The Debtors are parties to numerous leases of non-residential real property. In accordance with § 365(d)(4), the deadline to assume or reject such leases was originally May 12, 2010. By Order entered on May 6, 2010, this deadline was extended through August 10, 2010. As the deadline approached, the Debtors requested further extensions from various landlords. Many of the landlords agreed to such further extensions of the assumption/rejection deadline, including Global Tower, Crown Castle, C1C2 Investments LLC, Forever Communications, and Black Crow Properties. The current deadline to assume or reject these leases is November 8, 2010, however the Debtors have negotiated or are in the process of negotiating agreements with all nonresidential real property landlords for a further extension of the lease assumption or rejection deadline to the earlier of February 7, 2011 or Confirmation of the Plan.

Valdosta has petitioned the Bankruptcy Court to approve its assumption of two tower leases with Audrey Jordan Estate and Stan Carver, respectively. The hearing on this motion is scheduled for November 8, 2010. Rocket City's tower leases with Jerry Moore and Jerry Chesser were previously assumed by order entered August 11, 2010. In addition, the Debtors assumed the lease for their Jackson, TN studio with Billy and Gloria Thomas and exercised an option to extend that lease.

### E. Post-Petition Litigation.

1. GE Capital's Motions to Dismiss or Abstain and for Relief from the Automatic Stay.

On January 14, 2010, GE Capital filed a Motion for Dismissal or Suspension of these Chapter 11 Cases Against Certain of the Debtors Pursuant to Section 305(a)(1) of the Bankruptcy Code, seeking dismissal or suspension of the Chapter 11 Cases so that GE Capital could proceed with the Receivership Action pending in federal court in New York. On February 2, 2010, GE Capital filed a Motion of General Electric Capital Corporation for Relief From The Automatic Stay, seeking, similarly, to proceed with the Receivership Action in lieu of the chapter 11 process. The Debtors vigorously opposed both GE Capital motions. After conducting an evidentiary hearing on March 19, 2010, the Bankruptcy Court denied the motions.

2. GE Capital's Complaint to Determine Validity, Priority and Extent of Liens.

In conjunction with the hearings on DIP Financing, GE Capital argued that its Lien on Cash Collateral as of the Petition Date encompassed items in addition to Cash and accounts receivable, which the parties agreed aggregated $1.88 million. The additional items allegedly included $40,000 in Cash, approximately $242,000 the Debtors paid to Vision HR pre-petition in

connection with certain payroll expenses; approximately $201,000 in professional retainers; and approximately $1.3 million in unperformed advertising orders. Although GE Capital had a full opportunity to present evidence on these additional items at the March 19, 2010 hearing, GE Capital filed this adversary proceeding seeking, in essence, to relitigate these issues. The Debtors believe this Complaint is devoid of merit and are vigorously opposing the suit, which is pending and has not yet been set for trial.

3.  GE Capital's Complaint for Declaratory Judgment that the Estates Should not be Substantively Consolidated.

On August 31, 2010, GE Capital filed a complaint seeking declaratory judgment that the Debtors' chapter 11 estates should not be substantively consolidated. The Debtors believe this complaint is completely without merit and have filed a motion to dismiss this complaint, on grounds that it presents no case or controversy, is not ripe for adjudication and violates Federal Rule of Bankruptcy Procedure 7001. The Court held a preliminary hearing on Debtor's motion to dismiss the complaint on October 26, 2010, but did not decide the merits of the motion in light of the impending mediation.

4.  Debtors Valuation Motion.

On September 2, 2010, the Debtors filed a motion seeking to value the collateral securing GE Capital's Liens. The purpose of this motion is to establish the value of GE Capital's Secured Claim and Unsecured Deficiency Claim for purposes of the Plan and Confirmation. This motion is still pending and was initially set for preliminary hearing on September 28, 2010. The preliminary hearing was continued to November 19, 2010.

5.  Debtors' Equitable Subordination Complaint.

On October 4, 2010, the Debtors filed a complaint against GE Capital seeking to equitably subordinate its claims, transfer its Liens and for punitive and compensatory damages based upon GE Capital's egregious misconduct in conjunction with the Chapter 11 cases, including but not limited to the following:

- GE Capital improperly solicited the Committee to support a GE sponsored plan without required disclosures or court authorization;

- GE Capital engaged in unwarranted and unduly oppressive litigation tactics designed to drive up the cost of the chapter 11 cases and thwart the Debtors' reorganization efforts;

- GE Capital filed repeated excessive, over-reaching and frivolous motions;

- GE Capital displayed lack of candor with the Court and counsel;

- GE Capital produced more than 80,000 pages of unindexed documents in response to discovery;

- GE Capital switched out the expert witness report provided to Debtors' counsel in discovery from that used at trial;

- GE Capital filed frivolous and meritless lawsuits, including the Complaint to Determine Validity Priority and Extent of Liens and the Complaint seeking declaratory judgment that the Debtors' estates should not be substantively consolidated.

6.     Mediation.

At an omnibus hearing held on August 3, 2010, the Debtors and GE Capital announced to the Court their agreement to mediate their disputes in these cases, including the Debtor's proposed Plan and GE Capital's adversary proceeding to determine the validity, priority and extent of Liens. The parties further requested that the Court appoint the Honorable Catherine P. McEwen as mediator. By Order entered on August 5, 2010, Judge McEwen was appointed as mediator pursuant to Local Bankruptcy Rule 9019-2. The mediation is scheduled to take place on November 9, 2010 in Tampa, Florida.

**F.     Claims Process and Bar Date.**

1.     Schedules and Statements.

On February 11, 2010, each of the Debtors filed with the Bankruptcy Court their Schedules of Assets and Liabilities and Schedule of Executory Contracts and Unexpired Leases. On February 11, 2010, each of the Debtors filed their Statements of Financial Affairs (collectively, as may be amended, the "Schedules").

2.     Bar Date for Filing Proofs of Claim.

By Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines dated January 14, 2010, the Bankruptcy Court fixed May 18, 2010 as the last date by which proofs of claim could be filed in the Debtors' Chapter 11 Cases. Notice of the Claims Bar Date was mailed by the Bankruptcy Court clerk's office to all Creditors on January 14, 2010. On May 17, 2010 the Debtors filed Amendments to Schedules. On June 18, 2010, the Bankruptcy Court issued a Notice Fixing Times for Additional Creditors to File General Claims, fixing July 23, 2010 as the last date for Creditors affected by the Amendments to file a proof of claim.

3.     Amendment to Schedules.

On May 17, 2010, the Debtors filed certain amendments to their Schedules. As a result, the Court extended the Bar Date for those creditors listed on the amendments to July 23, 2010.

**G.     Exclusivity.**

On April 9, 2010, the Debtors filed their first motion with the Bankruptcy Court seeking an extension of the periods within which they can exclusively file a chapter 11 plan (the "Exclusive Filing Period") and solicit acceptances thereof (the "Exclusive Solicitation Period," and together with the Exclusive Filing Period, the "Exclusive Periods"). On May 6, 2010, the Bankruptcy Court entered an order granting a 90-day extension of the Exclusive Periods, without prejudice to the Debtors' right to seek additional extensions. Subsequent orders have been entered extending the Exclusive Periods through November 8, 2010 and January 10, 2011, respectively.

On November 8, 2010, the Debtors filed the Plan.

## IV.     Pension Plan Issues.

1.      Description of Pension Plans.

The Debtors have adopted the Vision HR retirement Savings Plan and its related trust (the "401K Plan") for all employees who elect to become participants.

2.      Status of Plan Contributions and Funding.

As of the Petition Date, the Debtors were current on any and all obligations related to the 401K Plan and have remained current since the filing of the Chapter 11 Cases. The Plan neither terminates nor impairs the 401K Plan. Similarly, the Plan does not affect Black Crow's future funding obligations under the 2006 Pension Act or other pension laws.

## V.     Treatment of Creditors and Shareholders Under the Plan.

The Plan governs the treatment of Claims against and Equity Interests in the Debtors in the Chapter 11 Cases. The Plan is premised upon the substantive consolidation of the Debtors. The table in Section B.2. below summarizes the treatment under the Plan for each Class.

### A.     Substantive Consolidation.

The Plan provides that on the Effective Date, the Debtors will be substantively consolidated for all purposes and actions (including, but not limited to, for purposes of voting, treatment, Confirmation and distributions under the Plan). On and after the Effective Date, (a) all assets and liabilities of the Debtors shall be deemed to be merged into or assigned to Reorganized Black Crow, (b) the Debtors' Estates will be deemed to be one consolidated estate for Black Crow Group, and (c) each and every Claim filed, to be filed or deemed filed in the Chapter 11 Cases, will be deemed filed against the Debtors collectively and shall be one Claim against and one obligation of the Debtors. Unless otherwise ordered by the Bankruptcy Court, the proposed substantive consolidation will not affect the pre-or post- Petition Date Liens and security interests of GE Capital, (b) defenses to any Causes of Action or (c) distributions from any insurance policies or proceeds of such policies.

In the event that the Bankruptcy Court does not consolidate the Debtors, then (a) nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any Claim against any other Debtor; (b) Claims against multiple Debtors shall be treated as separate Claims with respect to each Debtor's Estate for all purposes (including, without limitation, distributions and voting); (c) the Debtors shall have the right to withdraw the Plan, modify the Plan or proceed with the Plan as though it provides for one or more sub-plans with respect to any or all of the Debtors; (d) the Debtors shall have the right to proceed and/or to withdraw some or all of the sub-plans; and (e) the Debtors will not, and will not be with the Confirmation of one or more sub-plans together with or to the exclusion of other sub-plans required to, re-solicit votes with respect to the Plan. A vote to accept the Plan will also be deemed a vote to accept a separate sub-plan for each of the Debtors as to which the Claimant holds a Claim.

### B.     Summary of Classification and Treatment.

1.      Classification by Debtor.

The following table identifies the Classes of Claims against and Equity Interests in the Debtors.

| Classification of Claims | |
|---|---|
| Class 1 | Convenience Class |
| Class 2 | GE Capital Secured Claim |
| Class 3 | Other Secured Claims |
| Class 4 | GE Capital Deficiency Claim |
| Class 5 | Wolfe and Wells Claims |
| Class 6 | Barter Claims |
| Class 7 | License Claims |
| Class 8 | General Unsecured Claims |
| Class 9 | Interests in Black Crow Group |
| Class 10 | Interests in Operating Debtor Entities and Radio Debtor Entities |

## C.    Description of Classes for the Debtors.

Unless otherwise indicated, the characteristics and amount of the Claims or Equity Interest in the following Classes are based on the books and records of the Debtors.

1.      Class 1 Convenience Class.  This Class consists of Allowed Claims in the amount of $1,000 or less and Allowed Claims that elect to be included in the Convenience Class by agreeing to reduce the amount of their Allowed Claims to $1,000 or less. This Class is impaired and is entitled to vote on the Plan.

2.      Class 2 GE Capital Secured Claim.  This Class consists of the Allowed Secured Claim of GE Capital in an amount equal to the value of the Prepetition Collateral securing its Claim. This Class is impaired and is entitled to vote on the Plan.

3.      Class 3 Other Secured Claims.  This Class consists of other Secured Claims, including financed equipment leases.  This Class is impaired and is entitled to vote on the Plan.

4.      Class 4 GE Capital Deficiency Claim.  This Class consists of the Allowed Deficiency Claim of GE Capital.  This Class is impaired and is entitled to vote on the Plan.

5.      Class 5 Wolfe and Wells Claims.  This Class consists of the Claims of Wolfe and Wells, which are subordinate and have been assigned to GE Capital.  This Class is impaired and is entitled to vote on the Plan.

6.      Class 6 Barter Claims.  This Class consists of the Allowed Unsecured Claims of parties to barter contracts with the Debtors.  This Class is impaired and is entitled to vote on the Plan.

7.      Class 7 License Claims. This Class consists of the Claims of certain music copyright licensors.  This Class is impaired and is entitled to vote on the Plan.

8.     Class 8 General Unsecured Claims. This Class consists of Allowed General Unsecured Claims other than Class 1 Convenience Class Claims.  Class 8 is impaired and is entitled to vote on the Plan.

9.     Class 9 Interests in Black Crow Group.  This Class consists of the Equity Interests in TMI, Black Crow Broadcasting and Black Crow Group held by: (a) for TMI, J. Michael Linn Revocable Trust (a nondebtor affiliate); (b) for Black Crow Broadcasting, J. Michael Linn Revocable Trust; and (c) for Black Crow Group,  Black Crow Radio Partners, LLC (a nondebtor affiliate), J. Michael Linn Revocable Trust, TMI,  Black Crow Broadcasting and Spectrum.  This Class is impaired and is deemed to reject the Plan.

10.     Class 10 Interests In Operating Debtor Entities and Radio Debtor Entities.  This Class consists of the Equity Interests in the Operating Debtor Entities held by Black Crow Group, J. Michael Linn Revocable Trust and Billy H. Thomas, Jr. and the Equity Interests of the Operating Debtors and Thomas Radio LLC in the Radio Debtors.  This Class is impaired and is deemed to reject the Plan.

Classes 1-8 are impaired and entitled to vote on the Plan.

Classes 9 and 10 are impaired and are deemed to reject the Plan.

**D.     Unclassified Claims.**

1.     Administrative Expenses.

In order to confirm the Plan, Allowed Administrative Claims and Allowed Priority Tax Claims must be paid in full or in a manner otherwise agreeable to the Holders of those Claims. Administrative Expenses are the actual and necessary costs and expenses of the Debtors' Chapter 11 Cases.  Those expenses include, but are not limited to, post-petition salaries and other benefits for employees, post-petition rent for facilities and offices, amounts owed to vendors providing goods and services during the Chapter 11 Cases, license fees, and tax obligations incurred after the commencement of the Chapter 11 Cases, including interest, if applicable, under relevant state law.  Other administrative expenses include Professional Claims of the Professionals retained by the Debtors and the Committee and the obligations outstanding under the Debtors' DIP Loan. The Plan treats Professional Claims and the DIP Loan obligations separately from general Administrative Claims.  Similarly, under the Plan, Administrative Claims do not include any fees or charges assessed against the Estates of the Debtors under section 1920 of chapter 123 of title 28 of the United States Code.  Such statutory fees are governed by Section II.F. of the Plan, and will be paid on and after the Effective Date, and thereafter as may be required until entry of a final decree with respect to each of the Debtors.

Consistent with the requirements of the Bankruptcy Code, the Plan generally provides for Allowed Administrative Claims to be paid in full on the later of the Effective Date, the date that such Administrative Claim becomes Allowed, and the date that such Allowed Administrative Claim becomes due and payable, except for ongoing expenses, which the Debtors and Reorganized Debtor will pay in the ordinary course of operations in accordance with the past practice of the Debtors and the terms of the agreements governing such obligations, without the necessity to file a proof of claim ("Excluded Allowed Administrative Expenses").

A notice setting forth the Administrative Claim Bar Date will be (i) filed on the Bankruptcy Court's docket; and (ii) posted on the Debtors' case information website at

http://chap11epiqsystems.com/bcm. Further notice of the Administrative Claim Bar Date will be provided as may be directed by the Bankruptcy Court. Notwithstanding Bankruptcy Court Local Rule 3071-1, all requests for payment of an Administrative Claim that accrued on or before the Effective Date, other than Excluded Allowed Administrative Expenses, must be filed with the Bankruptcy Court and served on counsel for the Debtors by the Administrative Claim Bar Date. Except as to Excluded Allowed Administrative Expenses, any requests for payment of Administrative Claims that are not properly filed and served by the Administrative Claim Bar Date shall not appear on the register of claims maintained by the Claims agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtor or any action by the Bankruptcy Court.

The Reorganized Debtor, in its sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors shall have the right to object to any Administrative Claim within one hundred eighty (180) days after the Effective Date, subject to extensions from time to time by the Bankruptcy Court. Unless the Debtors or the Reorganized Debtor object to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtor object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

2. Priority Tax Claims.

Unless otherwise agreed with a Holder of an Allowed Priority Tax Claim, the Debtors will pay Allowed Priority Tax Claims, together with interest from the Effective Date at the statutory interest rate over a period not exceeding five (5) years after the Petition Date. The Debtors reserve the right to prepay, without penalty, at any time.

3. Debtor in Possession Financing.

The Debtors are party to the DIP Loan Documents as described above in Section III.C. The Debtors estimate that there will be approximately $1.2 Million outstanding under the DIP Loan on the Effective Date. It is currently anticipated that the Debtors and the DIP Lender will agree to convert the DIP Loan facility to New Membership Interests in Reorganized Black Crow. In such event, the DIP Loan will not be repaid on the Effective Date, but rather will convert to equity. The Liens in favor of the DIP Lender will terminate upon conversion of the DIP Lender's Claims to New Membership Interests.

4. Professionals Claims.

As of November 8, 2010, the Debtors' and the Committee's Professionals have filed fee applications in the Chapter 11 Cases in an aggregate amount of approximately $1,958,614.80 for the period from the Petition Date through August 31, 2010. The Debtors estimate that various Professionals will file fee applications for periods subsequent to August 31, 2010 for approximately $1,640,000, assuming the Effective Date of the Plan is March 31, 2011.

Pursuant to prior orders of the Court, the Debtors have withheld 20% of each Professional's monthly fees for the period from the Petition Date through August 31, 2010 ("20% Holdback"). For periods subsequent to August 31, 2010, as to which the Professionals have not yet filed fee applications, the Debtors are permitted to pay 70% of undisputed fees and 100% of undisputed expenses ("30% Holdback," and together with the 20% Holdback, the "Holdbacks").

In connection with the Confirmation of a Plan, the Debtors' Professionals and the Professionals retained by the Committee intend to file final fee applications for approval and payment of the Holdbacks.

     5.     Priority Non-Tax Claims.

Priority Non-Tax Claims are the types of Claims indentified in section 507(a) of the Bankruptcy Code that are entitled to priority in payment (other than Administrative Claims and Priority Tax Claims). For the Debtors, these Claims relate primarily to prepetition wages that had not been paid as of the Petition Date. Most, if not all, of these Claims have already been paid by the Debtors pursuant to an order entered by the Bankruptcy Court on the Petition Date. Thus, the debtors estimate that there are no Allowed Claims in this Classes.

     6.     Intercompany Claims.

On the Effective Date, or as soon thereafter as reasonably practicable, all Intercompany Claims will be discharged.

## E.     Treatment of Classified Claims and Equity Interests

     1.     <u>Class 1 Convenience Class</u>. Class 1 will be paid in full without interest on the Effective Date.

     2.     <u>Class 2 GE Capital Secured Claim</u>. GE Capital will be entitled to elect between two alternative treatments if it accepts the Plan, as follows;

     a.     *Alternative A*: GE Capital will receive, in full and final satisfaction of all Claims and Liens against the Debtors and their property, payment in Cash on the Effective Date in the amount of $13,000,000.

     b.     *Alternative B*: The GE Capital Secured Claim will be Allowed in an amount equal to the value of the Prepetition Collateral. The Allowed Secured Claim will be evidenced by the GE Capital Secured Claim Loan Documents, and will be paid pursuant to the following terms: (i) interest only at a fixed rate of 4% per annum over the term of the Promissory Note in monthly installments, plus (ii) 1% principal amortization in annual installments, plus, (iii) at the discretion of the Reorganized Debtor, a portion of the Excess Net Cash Flow in annual installments commencing in 2012. The balance of all accrued interest and unpaid principal shall be due in full at maturity on the Maturity Date. The Promissory Note will be secured by a first priority Lien in the GE Capital Post-Effective Date Collateral.

     c.     If GE Capital votes to reject the Plan, its Class 2 Claim will be Allowed in an amount equal to the value of the Prepetition Collateral and will be evidenced by the GE Capital Secured Claim Loan Documents, and will be paid pursuant to the following terms: (i) interest only at a fixed rate of 4% per annum over the term of the Promissory Note in monthly installments, plus (ii) 1% principal amortization in annual installments, plus, (iii) at the discretion of the Reorganized Debtor, a portion of the Excess Net Cash Flow in annual installments commencing in 2012. The balance of all accrued interest and unpaid principal shall be due in full at the Maturity Date. GE Capital shall retain its Liens on the Prepetition Collateral.

3.     Class 3 Other Secured Claims.  Equipment finance leases will be Allowed Secured Claims only (a) if the Holder properly perfected a security interest in the underlying collateral prepetition, and such security interest is not avoidable under any provision of law; and (b) to the extent of the value of the collateral as of the Confirmation Hearing.  Allowed Secured Claims of equipment finance lessors will receive, at the Debtors' option, either (i) deferred Cash payments equal to the present value of the collateral securing the Holder's Allowed Secured Claim, payable in monthly installments of principal and interest, with an amortization not to exceed five years from the Effective Date; or (ii) regular monthly payments as provided in the Claimants' agreements with the Debtors, with the term extended for a sufficient number of months to amortize any arrearages owed. Class 3 Claims that are not secured by properly perfected security interests shall be treated as Class 8 General Unsecured Claims.

4.     Class 4 GE Capital Deficiency Claim.

a.     If GE Capital votes to accept the Plan, GE Capital will be entitled to elect between the two alternative treatments described above in Section III.D.2.a. and 2.b.  In the event GE Capital elects the treatment set forth in Section III.D.2.b., in addition to the treatment therein specified, GE Capital will receive, on account of its Class 4 Claim, the right to receive twenty percent (20%) of the net proceeds or value, as applicable, of Reorganized Black Crow in excess of the first Three Million Dollars ($3,000,000) of net proceeds or value, as applicable, upon the first to occur of a Liquidity Event or the Maturity Date.

b.     If GE Capital votes to reject the Plan, the GE Capital Deficiency Claim will, if not subordinated, share Pro Rata with the Class 8 Claimants in the Class 8 Allocation.  If its Claims are subordinated, GE Capital will receive no distribution on account of the GE Capital Deficiency Claim.

5.     Class 5 Wolfe and Wells.  Notwithstanding any provision of the Wolfe and Wells Subordination Agreements, Wolfe and Wells will be entitled to vote their own Allowed Claims for or against the Plan.  If GE Capital accepts the Plan or its Claims are equitably subordinated, then Wolfe and Wells will each receive deferred payments equal to 25% of their Allowed Claims, without interest, penalties or fees, payable annually over a period of five (5) years commencing on the first anniversary of the Effective Date.  If GE Capital rejects the Plan and its Claims are not equitably subordinated, then the Class 5 Claimants will receive no distribution on account of their Claims.

6.     Class 6 Barter Claims.  In lieu of a Cash payment, the Debtors will provide advertising slots to each of the Class 6 Claimants, over a period of time not to exceed 18 months, at specific dates and times to be selected by the Debtors.

7.     Class 7 License Claims.  The Holders of Class 7 License Claims will receive Cash payments equal to 100 percent of their Allowed Claims, without interest, penalty or fees, payable as follows: 50% on the Effective Date, with the balance payable in one lump sum on the first anniversary of the Effective Date.

8.     Class 8 General Unsecured Claims.  Holders of Allowed Class 8 Claims will each receive a Pro Rata share of the Class 8 Allocation, in annual installments over a period of five (5) years commencing on the first Anniversary of the Effective Date.

9.    <u>Class 9 Interests in Black Crow Group</u>. The Class 9 Interests will be cancelled and the Holders of such Interests will not receive or retain any property on account of such Interests.

10.    <u>Class 10 Interests In Operating Debtor Entities and Radio Debtor Entities</u>. The Class 10 Interests will be cancelled and the Holders of such Interests will not receive or retain any property on account of such Interests.

## F. Securities Law Matters.

On the Effective Date of the Plan, the New Membership Interests will be issued to the New Equity Holder in consideration of the New Capital Contribution and the satisfaction and discharge of the DIP Loan.

1.    Issuance and Resale of New Securities Under the Plan.

Section 1145(a)(i) of the Bankruptcy Code generally exempts from registration under the Securities Act of 1933 (the "Securities Act") the offer or sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or an equity interest in, such debtor, or if such securities are offered or sold principally in such exchange and partly for Cash. In addition, in the case of rights so issued under a chapter 11 plan, section 1145(a)(2) also generally exempts the issuance of stock issued upon exercise of such rights. In reliance upon this exemption, the New Membership Interests to be issued to the New Equity Holder and equity securities that may be issued to employees under the Management Equity Incentive Program as provided in the Plan, will be exempt from the registration requirements of the Securities Act and of any state securities laws.

## G. Reservation of "Cram Down" Rights.

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan over the dissent of any Class of Claims or Equity Interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the reorganization process. It assures that no single group (or multiple groups) of Claims or Interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Debtors reserve the right to seek Confirmation of the Plan, notwithstanding the rejection of the Plan by any Class entitled to vote. In the event a Class votes to reject the Plan, the Debtors will request the Bankruptcy Court to rule that the Plan meets the requirements specified in section 1129(b) of the Bankruptcy Code with respect to such Class. The Debtors will also seek such a ruling with respect to each Class that is deemed to reject the Plan.

## VI. Voting Procedures and Requirements.

Detailed voting instructions are provided with the Ballot accompanying this Disclosure Statement. For purposes of the Plan, the following Classes are the only ones entitled to vote.

| Class | Description |
|-------|-------------|
| 1 | Convenience Claims |
| 2 | GE Capital Secured Claim |
| 3 | Other Secured Claims |
| 4 | GE Capital Deficiency Claim |
| 5 | Wolfe and Wells Claims |
| 6 | Barter Claims |
| 7 | License Claims |
| 8 | General Unsecured Claims |

If your Claim is not in one of these Classes, you are not entitled to vote on the Plan and you will not receive a Ballot with this Disclosure Statement. If your Claim is in one of these Classes, you should read your Ballot and follow the listed instructions carefully. Please use only the Ballot that accompanies this Disclosure Statement.

---

**IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT, YOU MAY CONTACT THE BALLOTING AGENT AT THE TELEPHONE NUMBER BELOW:**
**646-282-2400**

---

### A. Vote Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a Plan by a Class of Claims is determined by calculating the number and the amount of Claims voting to accept, based on the actual total allowed Claims voting. Acceptance requires an affirmative vote of more than one-half of the total Allowed Claims voting and two-thirds in amount of the total Allowed Claims voting.

### B. Classes Deemed to Accept or Reject.

Under the Bankruptcy Code, Creditors or Equity Interest Holders that are Unimpaired by the Plan are deemed to accept the Plan. Similarly, Creditors or Equity Interest Holders that are not entitled to receive property under the Plan are deemed not to accept the Plan. Equity Interest Holders of the Debtors in Classes 9 and 10 are not receiving or retaining any property and are therefore deemed not to have accepted the Plan.

### C. Voting.

In order for your vote to be counted, your vote must be actually *received* by the Balloting Agent at the following address before the Voting Deadline of 4:00 p.m., Prevailing Eastern Time on _____.

---

| Balloting Agent |
|-----------------|
| Overnight or Hand Delivery:<br><br>EPIQ Bankruptcy Solutions, LLC<br>Attn: BLACK CROW Ballot Processing Center<br>Processing Center<br>757 Third Avenue, 3rd Floor<br>New York, NY 10017 |

```
First Class Mail:

EPIQ Bankruptcy Solutions, LLC
Attn: Black Crow Media Group, LLC
Ballot Processing Center
FDR Station PO Box 5014
New York, NY 10150-5014

Telephone Number: 646-282-2400
```

If a Ballot is damaged or lost, you may contact the Debtors' Balloting Agent at the number set forth above. Any Ballot that is executed and returned but which does not indicate an acceptance or rejection of the Plan will not be counted.

## VII. Financial Information, Projections and Valuation Analysis.

### A. Projections.

Projected pro forma balance sheet, income statement and statement of cash flows (the "Projections") for Black Crow are attached as **Exhibit E** to the Disclosure Statement.

### B. Reorganization Valuation Analysis.

#### 1. Scope of Valuation Performed.

The Debtors engaged Peter Bowman ASA of Bowman Valuation Services (BVS, LLC) ("Bowman") to prepare a valuation analysis of the fair market value of the Reorganized Debtor. Specifically, the valuation was developed for purposes of (i) determining the fair market value of the company; (ii) determining the value of GE Capital's Allowed Secured Claim; and (iii) evaluating whether the Plan met the so-called "best interests test" under section 1129(a)(7) of the Bankruptcy Code. In preparing its analysis, Bowman has, among other matters, done the following: (i) reviewed certain recent financial statements of the Debtors; (ii) reviewed the Projections prepared by the Debtors' senior management and Debtors' financial analyst, Protiviti, Inc.; (iii) reviewed the assumptions underlying such Projections; (iv) prepared a discounted cash flow analysis of the business on a "going concern" basis; (v) considered the current and historical market values of media companies that are reasonably comparable to the Debtors; (vi) considered certain economic and industry information relevant to the business of the Reorganized Debtor; and (vii) discussed the current operations and prospects of the Debtors with senior management of the Debtors.

#### 2. Estimated Value.

Based on the analyses, reviews, discussions, considerations and assumptions outlined above, Bowman estimates that the fair market value of the Debtors is approximately $17,500,000.