## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

**BLACK CROW MEDIA GROUP, LLC,**
*et al.*,

Debtors.[1]

**Chapter 11**

**Case No. 3:10-bk-00172-PMG**
**Jointly Administered**

## MOTION OF GENERAL ELECTRIC CAPITAL CORPORATION FOR ENTRY OF AN ORDER PURSUANT TO SECTION 1121(D) OF THE BANKRUPTCY CODE TERMINATING THE EXCLUSIVITY PERIODS WITHIN WHICH THE DEBTORS MAY FILE AND SOLICIT ACCEPTANCES TO A PLAN OF REORGANIZATION

General Electric Capital Corporation ("GE Capital") moves this Court for an order pursuant to section 1121(d) of the Bankruptcy Court terminating the exclusive periods within which the Debtors may file and solicit acceptances to a plan of reorganization. In support of this Motion, GE Capital respectfully states as follows:

### Background

1.      On January 12, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1] The Debtors in these Chapter 11 cases are: (i) Black Crow Media Group, L.L.C.; (ii) Black Crow Media, L.L.C.; (iii) Black Crow Broadcasting, Inc.; (iv) Rocket City Broadcasting, L.L.C. (f/k/a STG Media, L.L.C.); (v) Black Crow Media of Valdosta, L.L.C. (f/k/a RTG Media, L.L.C.); (vi) Thomas Media Operations, L.L.C.; (vii) Black Crow Radio, L.L.C.; (viii) BCA Radio, L.L.C.; (ix) RTG Radio, L.L.C.; (x) Thomas Radio, L.L.C.; (xi) Thomas Media, Inc. and (xii) Rainbow Media, Inc.

2. GE Capital is the primary secured creditor of the Debtors and is owed in excess of $40,000,000 secured by first-priority liens on and security interests in substantially all of the assets of each Debtor (except Thomas Media, Inc. and Black Crow Broadcasting, Inc.), including the enterprise value of the Debtors' businesses and certain cash collateral.

3. On April 9, 2010, the Debtors filed their *Motion to Extend Exclusive Periods for Filing a Plan of Reorganization and Soliciting Acceptances* requesting a 120-day extension of the exclusive periods set forth in section 1121 of the Bankruptcy Code (the "Exclusivity Periods"). [Docket No. 174.]

4. On May 6, 2010, the Court entered an order granting the Debtors a 90-day extension of the Exclusivity Periods through August 10 and October 11, 2010. [Docket No. 221.]

5. On June 29, 2010, the Debtors filed their *Second Motion to Extend Exclusive Periods for Filing a Plan of Reorganization and Soliciting Acceptances* requesting an additional 90-day extension of the Exclusivity Periods. [Docket No. 337.]

6. On July 21, 2010, the Court entered an order granting the Debtors an additional 90-day extension of the Exclusivity Periods through November 8, 2010, and January 10, 2011 (the "Second Exclusivity Order"). [Docket No. 352.]

7. On November 8, 2010, the Debtors filed the *Joint Plan of Reorganization of Black Crow and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "Debtors' Plan") [Docket No. 427] and the *Disclosure Statement for the Joint Plan of Reorganization of Black Crow and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") [Docket No. 428]. All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Debtors' Plan.

## Preliminary Statement

8.      Pursuant to section 1121(c) of the Bankruptcy Code and the Second Exclusivity Order, the Debtors have until January 11, 2011 to obtain acceptances for the Debtors' Plan, and no party in interest may file a competing plan until either that time period expires or the Court, for cause, orders otherwise.[2]

9.      In light of the Debtors' Plan and Disclosure Statement, GE Capital requests that the Court terminate the Exclusivity Periods so that GE Capital may file a competing plan. The filing of the Debtors' Plan constitutes "cause" for the termination of the Exclusivity Periods because the Debtors' Plan (1) provides Paul Stone, a close friend of the Debtors' principal, the exclusive opportunity to purchase the equity of the Reorganized Debtor without exposing the purchase price to a competitive auction or any other market testing; and (2) gives Mr. Stone sole discretion to give up to 20% of the equity in the Reorganized Debtor back to Michael Linn, the Debtors' prior equity holder. Under applicable Supreme Court precedent, the filing of such a plan requires the termination of the Exclusivity Periods to allow competing plans.

10.     Furthermore, exclusivity should be terminated because the Debtors have not made good faith progress toward reorganization. Instead of using their extended Exclusivity Periods to negotiate with their stakeholders and formulate a confirmable plan, the Debtors have concocted a plan that shifts value from the Debtors' estates to Mr. Linn and Mr. Stone at the expense of the Debtors' creditors. Moreover, there is no reasonable prospect that the Debtors' Plan will be

---

[2] Pursuant to section 1121(c) of the Bankruptcy Code, if a trustee has not been appointed and the debtor files a chapter 11 plan within the exclusivity period set forth in section 1121(b), no party in interest may file a competing plan until the exclusive period for soliciting acceptances set forth in section 1121(c)(3) expires. In this case, a trustee has not been appointed and the Debtors filed a plan within the exclusivity period set forth in 1121(b), as extended by the Second Exclusivity Order.

3

confirmed; it violates the absolute priority rule, it classifies GE Capital's deficiency claim in a separate class to gerrymander an impaired accepting class, it is based on an impermissible substantive consolidation of the Debtors, it contains unlawful non-consensual third-party releases, it unfairly discriminates against one or more classes of creditors who will almost certainly vote against the Debtors' Plan, it violates section 510(a) of the Bankruptcy Code, and it otherwise violates the Bankruptcy Code. The Debtors' Plan has no reasonable prospect of being confirmed; in fact, the Debtors' Plan is unconfirmable on its face. Accordingly, the Exclusivity Periods should be terminated so that other parties in interest may file competing plans.

## **Legal Argument**

11. Section 1121(d) the Bankruptcy Code grants this Court the authority to reduce the Exclusivity Periods for cause. Section 1121(d) provides, in relevant part:

> [O]n request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

11 U.S.C. § 1121(d). The Bankruptcy Code does not specify the meaning of "cause" in the context of section 1121(d), but the provision "was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *United Savings Assocs. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987). In enacting section 1121(d), Congress sought to eliminate the "undue bargaining leverage" that continuing exclusivity conferred upon debtors. *In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989) (quoting H.R.Rep. No. 95-595, at 406 (1977)).

12. To determine whether to terminate the Exclusivity Periods, courts employ a flexible approach, taking into account the facts and circumstances of each case, including

"practical considerations, or other considerations in the interests of justice." *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006). Courts typically consider the following factors:

(a) the size and complexity of the case;

(b) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;

(c) the existence of good faith progress toward reorganization;

(d) the fact that the debtor is paying its bills as they become due;

(e) whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(f) whether the debtor has made progress in negotiations with its creditors;

(g) the amount of time which has elapsed in the case;

(h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

(i) whether an unresolved contingency exists.

*In re R.G. Pharm., Inc.*, 374 B.R. 484, 487 (Bankr. D. Conn. 2007) (quoting *Adelphia Comms.*, 352 B.R. at 587).

**A.      The Exclusivity Periods Should be Terminated Because the Debtors' Plan Would Sell the Equity of the Reorganized Debtor Without Any Means for Market Testing.**

13.      The absolute priority rule, codified in section 1129(b)(2)(B)(ii) of the Bankruptcy Code, prohibits the confirmation of a plan of reorganization over the objection of an impaired class of unsecured creditors if the plan does not provide full value for the unsecured claims in such class and distributes property to the holder of a junior interest or claim on account of such interest or claim. *Bank of Am. Nat'l Trust and Savings Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441–42 (1999). GE Capital will vote against the Debtors' Plan and will object to confirmation of the Debtors' Plan.

14.     The Debtors' Plan violates the absolute priority rule in at least two ways: (1) the Debtors' Plan provides Mr. Linn's close friend,[3] Mr. Stone, the exclusive opportunity to purchase 100% of the equity in the Reorganized Debtor without any type of market sales process to determine whether the price paid for the new equity is fair;[4] and (2) the Debtors' Plan gives Mr. Stone the sole discretion to distribute up to 20% of the equity back to Mr. Linn on account of Mr. Linn's future labor and management.[5]  Moreover, at the beginning of these cases, Mr. Stone testified that as the owner of the Reorganized Debtor he would allow Mr. Linn to retain a management position with the company and that Mr. Stone would have the opportunity to earn back equity in the Reorganized Debtor.  (Stone Dep. 48:16–49:7, Mar. 3, 2010.)  This arrangement constitutes a third violation of the absolute priority rule of the kind that has been specifically proscribed by the United States Supreme Court.  Considering this arrangement, it is clear why the Debtors have refused to market the company to other purchasers.  Because GE Capital and the Debtors' other creditors are not being paid in full, these equity distributions to Mr. Stone and Mr. Linn violate the absolute priority rule.  *See LaSalle*, 526 U.S. at 458 (holding that plans of reorganization providing insiders or junior interest holders "with exclusive

---

[3] Mr. Stone is involved in this restructuring, at least in part, to help Mr. Linn, the Debtors' Principal.  In his March 3, 2010, deposition, Stone testified that one reason that he was involved in the restructuring of the Debtors was to "help my friend Mike" and that he provided the DIP Loan "[b]ecause a friend asked me to." (Stone Dep. 10:17, 44:14.)

[4] The Disclosure Statement states, "The New Equity Holder will receive 100%  of the New Membership Interests of Reorganized Black Crow . . . ." (Disclosure Statement vi.)  The definition sections of the Debtors' Plan and Disclosure Statement provide that "'*New Equity Holder*' means Paul C. Stone."

[5] As of the effective date, 20% of the new equity in the Reorganized Debtor will be reserved for issuance to members of management of the Reorganized Debtor.  (Disclosure Statement 28.)  The Reorganized Debtor's management will consist of Mr. Stone (CEO), Mr. Linn (COO) and James Devis (CFO).  (Disclosure Statement 22.)  The terms of the Management Equity Plan are undisclosed and left to the discretion of the Reorganized Debtor.  (Disclosure Statement 28.)

opportunities free from competition without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)"); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 204 (1988) (holding that granting a prior equity holder new equity on account of future labor violates the absolute priority rule).

15.     In *Ahlers*, the Supreme Court considered whether a prior equity holder could retain an equity interest in the reorganized debtor, over the objection of impaired creditors, solely on account of contributions of labor, experience, and expertise. *Ahlers*, 485 U.S. at 201.  The Court stated that there "is little doubt that a reorganization plan in which respondents retain an equity interest in the [reorganized debtor] is contrary to the absolute priority rule." *Id.* at 202. The Court then held that "the pledge of future labor and management skills" is not "an adequate contribution to escape the absolute priority rule." *Id.* at 204–05; *see also In re Young*, 430 B.R. 99, 140–41 (Bankr. S.D.N.Y. 2010) (denying confirmation of a plan that distributed equity in the reorganized debtor to a prior equity holder "'on account' of his work going forward and the necessity of his cooperation so as to comply with the Credit Agreement"); *In re SM 104 Ltd.*, 160 B.R. 202, 226 (Bankr. S.D. Fla. 1993) (holding that "[new value] cannot merely be a promise to do something in the future, such as a promise to manage the reorganized debtor or guaranty a loan to the reorganized debtor").  Accordingly, the distribution of equity to Mr. Linn pursuant to the Management Equity Plan is a violation of the absolute priority rule.

16.     Ten years after *Ahlers*, the Supreme Court returned to the absolute priority rule and considered whether a plan could provide prior equity holders with the exclusive right to purchase the ownership interest in the reorganized entity. *LaSalle*, 526 U.S. at 437.  According to the Court, the relevant question was whether the new equity distribution was received "on

account of" the prior equity holder's interest in the debtor.[6]  *Id.* at 450–51.  Equity would be

deemed to be distributed "on account of the prior interest," and the plan would therefore fail, the

Court reasoned, if the equity was sold at a price that failed "to provide the greatest possible

addition to the bankruptcy estate."  *Id.* at 453.  The price would always be "too low when the

equity holders obtained or preserved an ownership interest for less than someone else would

have paid."  *Id.*

17.     Importantly, the Court emphasized that a judicial valuation would not be

sufficient to determine if the price paid equaled the actual value of the new equity.  *Id.* at 457

(noting that there should be a "disfavor for [judicial valuation] decisions untested by competitive

choice . . . when some form of market valuation may be available").  A plan proponent can only

demonstrate the equity is being sold for "top dollar" by requiring some form of "market testing":

"[u]nder a plan granting an exclusive right, making no provision for competing bids or

competing plans, any determination that the price was top dollar would necessarily be made by a

judge in bankruptcy court, whereas the best way to determine value is exposure to a market."  *Id.*

The Court declined to establish any precise mechanisms for market testing the sale of equity

under a plan, but it suggested that either exclusivity must be terminated or the new equity must

be exposed to a competitive auction.  *Id.* at 454 ("[The plan] is doomed, we can say without

necessarily exhausting its flaws, by its provision for vesting equity in the reorganized business in

---

[6] Some courts recognize a "new value" exception or corollary to the absolute priority rule such that a plan may distribute new equity to a prior equity holder in exchange for a fresh capital contribution.  *LaSalle*, 526 U.S. at 444.  Such a distribution, these courts conclude, falls outside the prohibition of section 1129(b)(2)(B)(ii) because the equity holder receives the new equity in exchange for new value, not "on account" of its prior interest.  *Id.* at 453.  The *LaSalle* Court decided the case without addressing whether the new value exception survived the enactment of the Bankruptcy Code.

the Debtor's partners without extending an opportunity to anyone else either to compete for that equity or *to propose a competing reorganization plan*." (emphasis added)).

18.     Like the plan in *LaSalle*, the Debtors' Plan provides for the sale of equity to an individual of the Debtors' choosing without any marketing process or competitive auction to confirm that the price paid by Mr. Stone is equivalent to the value he is receiving.  Although Mr. Stone is not a prior equity holder, the distribution of equity to him without any market testing violates *LaSalle* because he is a close friend of Mr. Linn and the Debtors, controlled by Mr. Linn, selected Mr. Stone without pursuing any other purchasers.  *See In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 49 (Bankr. D. Del. 2000) (denying confirmation because the plan violated the absolute priority rule by allowing "the existing controlling shareholder to determine, without the benefit of a public auction or competing plans, who will own the equity of [the Reorganized Debtor] and how much they will pay for the privilege"); *In re Homestead Partners, Ltd.*, 197 B.R. 706, 716 (Bankr. N.D. Ga. 1996) ("[T]he presence of an exclusive opportunity to buy stock in the reorganized debtor reveals itself as a de facto violation of absolute priority and an insurmountable barrier to confirmation.").  Although the Debtors' decision to deal exclusively with Mr. Stone is unsurprising considering the benefits that Mr. Stone is offering his friend Mr. Linn, it is a violation of the absolute priority rule.  In *Global Ocean Carriers*, the plan proponent argued that *LaSalle* did not apply because the purchaser was not a prior equity holder.  251 B.R. at 48.  The Bankruptcy Court for the District of Delaware declined to read *LaSalle* so "narrowly" and held that the plan was not confirmable, regardless of whether the purchaser was a prior equity holder, a straw party for the prior equity holder, or a legitimate third-party purchaser.  *Id.*

19.     Because the Debtors' Plan does not provide for any market testing of the value of the new equity, the Exclusivity Periods must be terminated.  *See In re Situation Mgmt. Sys., Inc.*,

252 B.R. 859, 864 (Bankr. D. Mass. 2000) (noting that terminating exclusivity provides an adequate method for valuing the equity interest of a reorganized debtor); *Global Ocean Carriers*, 251 B.R. at 49 (concluding that market testing may be "achieved by either terminating exclusivity and allowing others to file a competing plan or allowing others to bid for the equity"). The Supreme Court's decision in *LaSalle* requires that debtors proposing plans that distribute new equity on account of a fresh capital contribution either terminate exclusivity or provide for a competitive auction of the new equity. *See In re Union Fin. Servs. Group, Inc.*, 303 B.R. 390, 424 (Bankr. E.D. Mo. 2003); *Situation Mgmt. Sys.*, 252 B.R. at 864; *Global Ocean Carriers*, 251 B.R. at 49; *In re CGE Shattuck, LLC*, No. 99-12287-JMD, 1999 BNH 46, 1999 Bankr. LEXIS 1880, at *18–*19 (Bankr. D.N.H. Dec. 20, 1999). Market testing is the only way to ensure that the Debtors' value is retained for the benefit of the Debtors' estates and not unfairly transferred to the purchaser and the prior equity holder. *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 247 (5th Cir. 2009);[7] *Homestead Partners*, 197 B.R. at 716 ("[A] competitive market is the only mechanism to insure that all value is transferred to creditors in a new value plan and that [the purchaser] is not using the bankruptcy process to get a bargain.") Without a competitive auction or the termination of exclusivity, "a plan proponent who sells new equity via exclusive option will find himself incapable of proving that he has captured the full value of a key component to

---

[7] Although the court in *Pacific Lumber* did ultimately confirm a plan based on expert valuation testimony, it did so only after expressly finding that the creditors' collateral was "marketed thoroughly to the public before and during the bankruptcy case," *Pacific Lumber*, 584 F.3d at 247, as required by section 1129(a)(3), that the creditors consented both to the speed of the confirmation process and the lifting of exclusivity only as to specific parties both of which allegedly limited the marketing efforts, *id.*, and that the creditors had not received a bid at or above their proposed valuation despite contemporaneous marketing efforts. *Id.* at 248. No such marketing has occurred here or is proposed by the Debtors.

the interest which he proposes to transfer." *Id.* Because the Debtors' Plan provides Mr. Stone, a close friend of the Debtors' principal, with the exclusive opportunity to purchase the equity in the Reorganized Debtor free from any competition or market testing and on terms that so clearly benefit Mr. Linn, the Exclusivity Periods should be terminated to allow for competing plans.

**B.      The Exclusivity Periods Should be Terminated Because the Debtors Have Not Made Good Faith Progress Toward Reorganization.**

20.      The Debtors have not made good faith progress toward reorganization. These cases have been pending for over ten months, and the Debtors have received two extensions of exclusivity. However, in formulating the Debtors' Plan, the Debtors did not consult or negotiate with GE Capital, and, upon information and belief, the Debtors did not consult or negotiate with the Committee regarding the terms of their proposed plan. Instead of using the extended Exclusivity Periods to negotiate with their stakeholders to propose a plan that is in the best interests of the Debtors' estates, the Debtors have proposed a plan that transfers substantial value to Mr. Stone and Mr. Linn (and that threatens a transfer of additional undisclosed value to Mr. Linn) at the expense of the Debtors' creditors. The Debtors should not be permitted to use the Exclusivity Periods as leverage to pressure GE Capital and the Debtors' other creditors to agree to such a faulty plan. *See Teachers Ins. and Annuity Assoc. v. Lake in the Woods (In re Lake in the Woods)*, 10 B.R. 338, 346 (Bankr. E.D. Mich. 1981) (holding that "extensions are impermissible if they are for the purpose of allowing the debtor to prolong reorganization while pressuring a creditor to accede to its point of view on an issue in dispute").

*1.      The Debtors' Plan constitutes a breach of the Debtors' fiduciary duties to their creditors and provides for impermissible releases.*

21.      As discussed above, the Debtors' Plan is flawed because, without engaging in any competitive marketing process, the Debtors crafted the Plan to provide Mr. Stone the exclusive option to purchase the equity of the Reorganized Debtors on terms that allow Mr. Linn to receive

a substantial equity interest. Under *LaSalle* and *Ahlers*, this renders the Debtors' Plan unconfirmable. *See In re MJ Metal Prods., Inc.*, 292 B.R. 702, 705 (Bankr. D. Wyo. 2003) (holding that the proposed plan was contrary to *LaSalle* because it provided existing shareholders with the exclusive right to bid on the equity of the reorganized debtors); *S. Pac. Trans. Co. v. Voluntary Purchasing Groups, Inc.*, 252 B.R. 373, 390 (E.D. Tex. 2000) (reversing confirmation of debtor's plan because, in part, the debtors failed to present sufficient evidence that the new contribution was equivalent to the equity interest received); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997) (refusing to approve sale because the debtors did not pursue "an intensive effort to drum up the best price obtainable for the creditors"); *see also Union Fin. Servs.*, 303 B.R. at 425–26 (evaluating and approving the substantial marketing process, which involved independent directors and professional financial advisors, the debtors engaged in to satisfy *LaSalle*).

22. Not only does the Debtors' failure to market test the distribution of equity render the Debtors' Plan unconfirmable, but it also constitutes an abuse of the Debtors' fiduciary duties of loyalty and care owed to their creditors. *See Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 564–65 (Bankr. D. Del. 2008) (finding that plaintiff alleged sufficient facts for a breach of fiduciary duty claim where directors and officers failed to engage in a thorough sale process); *see also In re Cara Corp.*, No. 90-15397S, 1992 Bankr. LEXIS 672, at *1–*2 (Bankr. E.D. Penn. Apr. 27, 1992) (denying confirmation because the proposed plan violated fiduciary duties). The Debtors, along with their officers, have fiduciary duties of care and loyalty to the Debtors' estates and the Debtors' creditors. *See In re Brook Valley VII*, 496 F.3d 892, 900 (8th Cir. 2007) ("Debtors in possession along with those that control them owe fiduciary duties to the bankruptcy estate"); *see also Commodity*

12

*Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348–49 (1985) (noting that managers have a "fiduciary duty to act in the best interest of the corporation and not of themselves as individuals"). A debtor in possession and its managers must run the debtor's businesses "as agents of the bankruptcy estate, and not for their own personal gain." *Id.* The Debtors' refusal to consider or seek out other purchase offers is a breach of these fiduciary duties. *Bridgeport*, 388 B.R. at 565 (declining to dismiss a breach of fiduciary duty claim because plaintiff alleged that no "competitive bidding process took place and no investment banker was hired to 'shop' the deal . . . . [And only] cursory contacts were made to search for strategic buyers"); *see also Bidermann Indus.*, 203 B.R. at 551–53 (refusing to approve proposed sale of debtor's assets in the absence of any serious attempt to market the debtor's assets and holding that the proposed sale was not the best offer for the debtor's assets but was based on management's and the principal shareholder's desire for personal gain).

23. Moreover, because the Debtors' Plan transfers the Reorganized Debtor's equity to a close friend of Mr. Linn on terms that benefit Mr. Linn, the plan runs afoul of the duty of loyalty. "The duties of loyalty and good faith require directors and officers to put the interests of the company above their own interests and those of others." *Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Tech. Olympic, S.A. (In re Tousa, Inc.)*, 2010 Bankr. LEXIS 3303, at *30 (Bankr. S.D. Fla. Oct. 4, 2010). "A debtor in possession [along with its senior officers] is bound by a duty of loyalty that includes an obligation to refrain from self dealing, to avoid conflicts of interests and the appearance of impropriety." *In re Coram Healthcare Corp.*, 271 B.R. 228, 235 (Bankr. D. Del. 2001). Mr. Linn is using his control over the Debtors to transfer the Debtors' assets to his close friend at a bargain price and on terms that directly benefit Mr. Linn.

24.     This breach of the Debtors' and their managers' fiduciary duties is all the more alarming considering that the Debtors' Plan attempts to secure broad non-consensual third-party releases.  The Debtors' Plan provides that

> on and after the Effective Date, each Holder of a claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the exculpated Parties and the Released Parties from any and all Claims, Interests, obligations, suits, judgments, damages, rights Causes of Action and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors . . . .

(Debtors' Plan IX.G.)  According to the Definitions Section of the Plan, the Release Parties and Exculpated Parties include the officers, directors, and principals of the Debtors.  These non-consensual third-party releases are prohibited.  *See In re Pacific Lumber Co.*, 584 F.3d at 253.  Moreover, the releases are also flawed because no consideration is offered to support them.  *See Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 213 (3d Cir. 2000) (noting that releases must be supported by consideration).

25.     The "Release by the Debtors" provision in section IX.F of the Debtors' Plan is likewise impermissible because the Release Parties have not provided any consideration for these releases.  These releases would prevent the Debtors' estates from pursuing any potential breach of fiduciary duty claim against the Debtors' officers, managers and directors.

26.     For similar reasons, the Exculpation provision in the Debtors' Plan is flawed.  The Exculpation provision provides: "no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation cause of Action or liability for any exculpated Claim, except for fraud, gross negligence, willful misconduct or criminal conduct . . . ."  (Debtors' Plan IX.H.)  "Exculpated Claim" is defined broadly in the Plan to include:

> any act or omission . . . in connection with, relating to or arising out of the Debtors' restructuring efforts, the Debtors' Chapter 11 Cases, the formulation,

preparation, dissemination, negotiation, filing, implementation, administration, Confirmation or consummation of any of the Plan, the Disclosure Statement concerning the Plan . . . .

"Exculpated Party" is defined to include the Debtors, the Reorganized Debtor and their Affiliates, the Committee, and, with respect to each of the foregoing, their subsidiaries, affiliates, officers, directors, principals, and members.  This broad Exculpation is provided to certain non-debtors without any type of consideration and without any demonstration that the Exculpated Parties made any substantial contribution to the Debtors' estates.  Again, GE Capital believes that Mr. Linn and any other individual exercising control over the Debtors violated their fiduciary duties to the detriment of the Debtors' creditors by refusing to market the Debtors' assets to anyone other than Mr. Stone.  Accordingly, the Exculpation provision is impermissible.  *See In re Exide Techs.*, 303 B.R. 48, 75 (Bankr. D. Del. 2003) (holding that Exculpation provisions were impermissible for lack of consideration and lack of substantial contribution).

### 2.  The Debtors' Plan impermissibly classifies GE Capital's deficiency claim in a separate class from other general unsecured claims.

27.  The Debtors are not permitted to gerrymander an accepting, impaired class by separately classifying GE Capital from the other non-insider unsecured creditors.  Section 1122 of the Bankruptcy Code states, in pertinent part:  "(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  *See* 11 U.S.C. 1122(a).

28.  A "majority of circuits that have examined the treatment of similar claims have held that the proponent of a plan must demonstrate a justification for its classification scheme and that the classification is not motivated by the purpose of gerrymandering an affirmative vote of an impaired class."  *In re Holley Garden Apartments, Ltd.*, 223 B.R. 822, 824 (M.D. Fla. 1998) (citations omitted).  The Court in *Holley Garden* continued by stating that "[t]he one clear

rule that emerges from otherwise muddled caselaw on § 1122 claims classification [is] thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Holley Garden*, 223 B.R. at 824; *see also In re Greystone III Joint Venture*, 995 F.2d 1274, 1281 (5th Cir. 1991); *see also In re Suncruz Casinos, LLC*, 298 B.R. 833, 837 (Bankr. S.D. Fla. 2003) (collecting cases). The Disclosure Statement fails to provide any legitimate justification for the five different classes of unsecured creditors created by the Debtors' Plan. Moreover, considering the fact that the Debtors' capital structure is relatively simple and the Debtors are seeking substantive consolidation of their estates, there is no justification for eight voting classes.

> **3.     The Debtors' Plan is based upon an unjustifiable substantive consolidation of the Debtors.**

29.     The Debtors' Plan provides for the substantive consolidation of the Debtors upon the Effective Date. There is no basis, however, for substantive consolidation of the FCC Debtors, and consolidation of those entities would severely prejudice GE Capital's rights under the loan documents. Substantive consolidation is an extreme and unusual remedy and should be used sparingly. *See Eastgroup Props. v. S. Motel Ass'n*, 935 F. 2d 245, 248 (11th Cir. 1991). The standard for determining whether to grant substantive consolidation is:

> the proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit. . . . When this showing is made, a presumption arises that creditors have not relied solely on the credit of one of the entities involved. . . . Once the proponent has made this *prima facie* case for consolidation, the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation. . . . Finally, if an objecting creditor has made this showing, the court may order consolidation only if it determines that the demonstrated benefits of consolidation heavily outweigh the harm.

*In re Optical Tech., Inc.*, 221 B.R. 909, 913 (M.D. Fla. 1998) (Paskay, C.J.) (internal quotations and citations omitted); *see also Eastgroup Props.*, 935 F. 2d at 248.

30.     The Debtors cannot make the necessary initial showing that (1) there is substantial identity between the entities to be consolidated and (2) consolidation is necessary to avoid some harm or to realize some benefit.

31.     First, the Debtors cannot establish "substantial identity between the entities to be consolidated" because each of the Debtors operate radio stations under different call names in various locations in Alabama, Florida, Georgia, and Tennessee.   In fact, the Debtors' own pleadings state "the Debtors' radio stations provide a unique and vital service to the local communities in which they operate, ***having been organized, from inception, as a decentralized group of separate market clusters under separate corporate entities designed to function with a singular focus on the local market.***"   (*See* Debtors' Opposition to Motion for Dismissal, Feb. 15, 2010, ¶ 2 [Docket No. 103] (emphasis added)).   The Debtors further assert that their "radio stations provide a forum for locally originated content with local personalities. . . .   Debtors' stations have carefully cultivated a personal connection with their listeners and advertisers, demonstrated by the fact that approximately 90% of the Debtors' ***revenue is derived from the local marketplaces***."   (*Id.* (emphasis added).)

32.     Second, the Debtors cannot establish that substantive consolidation is necessary to avoid harm and realize a benefit.   The Debtors filed separate and independent Schedules and SOFAs for each and every one of the Debtors.   Accordingly, the Debtors cannot argue that there is a degree of difficulty in segregating and ascertaining individual assets and liabilities.   *See Optical Tech.*, 221 B.R. at 913 (identifying the difficulty in segregating and ascertaining individual assets as one factor in determining whether to substantively consolidate separate

bankruptcy estates). Moreover, as stated above, the Debtors are separate and independent entities that operate under different call stations in various jurisdictions that were designed to function with a singular focus on the local market. Therefore, the Debtors cannot argue that there is "consolidation at a single physical location". *See id.*

33. Even if the Debtors could make the necessary initial showing, GE Capital can easily demonstrate that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation. First, it is clear from the loan documents that GE Capital relied on the separateness of the Debtors, particularly Black Crow Radio, L.L.C.; BCA Radio, L.L.C.; RTG Radio, L.L.C.; Thomas Radio, L.L.C.; and Rainbow Media, Inc. (collectively, the "<u>FCC Debtors</u>").[8] GE Capital bargained for provisions in the loan documents prohibiting the FCC Debtors from having any business activities or indebtedness, other than the amounts owed to GE Capital. In extending approximately $48 million to the Debtors, GE Capital relied heavily (and in fact required) that the FCC Debtors be established as separate entities from the other Debtors.

34. Second, substantive consolidation will significantly prejudice GE Capital by, in effect, nullifying GE Capital's bargained-for protections under the Credit Agreement. In the Credit Agreement, GE Capital specifically negotiated provisions that would keep the FCC Debtors separate from the non-FCC Debtors and would keep the FCC Debtors from incurring any additional liabilities. Accordingly, ignoring these requirements and granting substantive consolidation would "certainly be a violation of due process if the order of substantive

---

[8] These Debtors are referred to as the FCC Debtors because their sole function is to hold FCC licenses. The FCC Debtors are special purpose entities that hold no assets other than the FCC Licenses. Furthermore, the FCC Debtors are not permitted to incur any indebtedness apart from their obligations to GE Capital.

consolidation would operate to destroy the defenses and rights which existed prior to the entry of the order of substantive consolidation." *See Gray v. Mankflow (In re Optical Tech., Inc.)*, 252 B.R. 531, 540 (M.D. Fla. 2000) (quoting *Murray Indus., Inc.*, 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991) (holding that substantive consolidation did not operate to nullify the Department of Revenue's sovereign immunity)), *aff'd*, 246 F.3d 1332 (11th Cir. 2001).

**4.    The Debtors' Plan violates section 510(a) of the Bankruptcy Code.**

35.    The Debtors' Plan provides, "*Notwithstanding any provision of the Wolfe and Wells Subordination Agreements*, Wofle and Wells will be entitled to vote their own Allowed Claims for or against the Plan." (Debtors' Plan III.D.5 (emphasis added).)  The Wolfe and Wells Subordination Agreements, however, expressly assign the claims of Wolfe and Wells to GE Capital in the event that the Debtors file for bankruptcy.  The Wolfe and Wells claims, therefore, were assigned to GE Capital as of the Petition Date, and GE Capital is entitled to vote those claims.  By attempting to nullify these provisions of the Wolfe and Wells Subordination Agreements, the Debtors' Plan violates section 510(a) of the Bankruptcy Code, which provides that a "subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable bankruptcy law."  11 U.S.C. § 510(a); *see also In re Ion Media Networks, Inc.*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) (holding that intercreditor agreements are enforceable contracts under section 510(a) "and the Court will not disturb the bargained-for rights and restrictions governing the second lien debt").

36.    The Wolfe and Wells claims are also unfairly discriminated against by the Debtors' Plan.  The Debtors' Plan classifies the Wolfe and Wells claims in their own class, Class 5, and provides that these claims receive no distribution if GE Capital rejects the Debtors' Plan. (Debtors' Plan III.D.5.)  This treatment is clearly less favorable than the treatment accorded to

19

general unsecured creditors under the Debtors' Plan and will constitute a violation of section 1129(b)(1) of the Bankruptcy Code. There is no basis to allocate less to these claims than to other general unsecured claims. The only purpose is to harm GE Capital by negating the effect of the Subordination Agreements, which if enforced as required by section 510(a) of the Bankruptcy Code would enable GE Capital to obtain the plan distributions on account of the Wolfe and Wells claims.

37.     As the foregoing demonstrates, (1) the Debtors have not made good faith progress toward reorganization; (2) the Debtors do not have reasonable prospects of confirming the plan; and (3) the Debtors have not made any progress negotiating with their creditors. Accordingly, cause exists for the termination of the Exclusivity Periods, and GE Capital should be permitted to file a competing plan.

## Conclusion

38.     The Exclusivity Periods must be terminated because the Debtors' Plan provides Mr. Stone with the exclusive opportunity to purchase the equity of the Reorganized Debtors without exposing the purchase price to any market test and on terms that directly benefit Mr. Linn. This alone is grounds for terminating exclusivity. Furthermore, the Debtors have used their extended Exclusivity Periods to propose a plan that has no reasonable prospect of being confirmed without consulting with GE Capital and the Committee. Other parties in interest should now have an opportunity to put forth competing plans in an effort to achieve maximum value for the Debtors' estates.

WHEREFORE, GE Capital respectfully requests that this Court enter an order:

(1)     granting this Motion;

(2)     terminating the Exclusivity Periods; and

(3)     granting GE Capital such other and further relief as may be just and proper.


This 16th day of November 2010.          Respectfully submitted,

                                         SMITH HULSEY & BUSEY


                                            */s/ Cynthia C. Jackson*
                                              Cynthia C. Jackson

                                         Florida Bar Number 498882
                                         225 Water Street, Suite 1800
                                         Jacksonville, Florida 32202
                                         Telephone: (904) 359-7700
                                         Facsimile: (904) 359-7708
                                         cjackson@smithhulsey.com
                                                 and

                                         KING & SPALDING LLP

                                         Sarah Robinson Borders
                                         John F. Isbell
                                         Jeffrey R. Dutson
                                         1180 Peachtree Street, N.E.
                                         Atlanta, Georgia 30309-3521
                                         Telephone: (404) 572-4600
                                         Facsimile: (404) 572-5100

                                         *Co-Counsel for General Electric Capital Corporation*

<u>Certificate of Service</u>

I certify that on this 16th day of November, 2010, a copy of the foregoing has been furnished electronically through the Court's CM/ECF electronic notification system to all parties interest, including (i) R. Scott Shuker, Esq., Latham Shuker Eden & Beaudine LLP, Post Office Box 3353, Orlando, FL 32802 and (ii) Dylan G. Trache, Esq., Wiley Rein LLP, 7925 Jones Branch Drive Suite 6200, McLean, VA 22102 and by mail to those on the attached matrix.

*s/ Cynthia C. Jackson*
Attorney

```
Label Matrix for local noticing        ASCAP                              AT&T
113A-3                                  PO Box 70547                       P.O. Box 5019
Case 3:10-bk-00172-PMG                  Chicago, IL  60673-0547            Carol Stream, IL  60197-5019
Middle District of Florida
Jacksonville
Tue Nov 16 09:42:34 EST 2010

AT&T                                    Aenas Communications               All American Electrical
PO Box 105262                           300 N. Cumberland St.              1471 San Jose Blvd
Atlanta, GA  30348-5262                 Jackson, TN 38301-5406             Holly Hill, FL 32117-1931


Andre Labat                             Arbitron Inc.                      Arbitron, Inc.
375 Bill France Blvd., #56              P.O. Box 3228                      c/o Sean Mulcahy
Daytona Beach, FL 32114-1521            Carol Stream, IL  60132-3228       9704 Patuxent Woods Dr.
                                                                           Columbia, MD  21046


Arbitron, Inc.                          Aristo Clean                       Armstrong Transmitter
9705 Patuxent Woods Dr.                 30 Timber Trail                    4835 North Street Road
Columbia, MD 21046-1572                 Port Orange, FL 32127-5941         Marcellus, NY 13108-9715


Austin Keyes                            B&E Electronics                    BMI Radio
3456 Maplewood Avenue                   3890 North Highland Ave.           P.O. Box 406833
Los Angeles, CA 90066-2253              Jackson, TN 38305-8773             Atlanta, GA  30384-6833


Bank of America                         Brad Travis                        C1C2 Investments LLC
PO Box 15710                            121 Silver Oaks Lane               126 W International Spdway Blvd
Wilmington, DE  19886-5710              Huntsville, AL 35806-4207          Daytona Beach, FL 32114-4322


Caldwell's Leasing                      Carter Davis                       City of Jackon
P.O. Box 99                             4655 Johnson Cove                  P.O. Box 2391
Union City, TN 38281-0099               Memphis, TN 38117-1830             Jackson, TN 38302-2391


Colquitt Electric Membership Corp       Columbia HS QB Club                Dave Hacker
PO Box 3608                             P.O. Box 3604                      745 Highfield Road
Moultrie, GA 31776-3608                 Lake City, FL 32056-3604           McKenzie, TN 38201-7645


Deltacom                                Design Marketing                   Digital Sound & Video, Inc.
P.O. Box 740597                         4240 Gator Trace Blvd., Ste. F     533 N. Nova Road Suite 113
Atlanta, GA 30374-0597                  Ft. Pierce, FL 34982-5261          Ormond Beach, FL 32174-4420


Dreammaker Entertainment                EME Communications                 Enticent, Inc.
650 Suntemple Dr                        c/o Clyde Scott                    PO Box 65202
Suite 102                               293 JC Saunders Rd                 Attn: Tracy Bell
Madison, AL 35758-5905                  Moultrie, GA  31768-0349           Charlotte, NC 28265-0202
```

Flash Flood Production
P.O. Box 718
Tarpon Srpings, FL 34688-0718

Florida Power & Light
General Mail Facility
Miami, FL 33188-0001

Florida Power and Light
FPL general Mail Facility
Miami Fl 33188-0001

Forever Communications
1919 Scottsville Road
Bowling Green, KY 42104-3303

Frank Barnas
201 East Brookwood Place
Valdosta, GA 31602-3854

Frank Barnes
1711 Ellis Dr
Valdosta Ga 31601-3573

Frederic M Wells
10022 Westleigh Drive
Huntsville, Al 35803-1645

Frederic M. Wells
(for the Estate of Frederic E. Wells)
10022 Westleigh Dr.
Huntsville, AL 35803-1645

Frederick Wells
10022 Westleigh Dr. SE
Huntsville, AL 35803-1645

GE Capital Corp
2325 Lakeview Pwky
Suite 700
Alpharetta, GA 30009-7921

GE Capital Corp.
c/o Heath D. Rosenblat, Esq.
1185 Avenue of the Americas
New York, NY 10036-2601

GE Capital Cplc
PO Box 2090
Portland, OR 97015

GE Electric Capital Corp.
c/o Sarah Borders, Esq.
1180 Peachtree Steet, N.E.
Atlanta, GA 30309-3531

Ga Power
96 Annex
Atlanta, GA 30396-0002

Gabriel Media
POB 210706
Nashville Tn 37221-0706

General Electric Capital Corporation
c/o Cynthia C. Jackson, Esq.
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, FL 32202-4494

Gibson Electric
P.O. Box 47
Trenton, NJ 38382-0047

Grant Thornton LLP
P.O. Box 532019
Atlanta, GA  30353-2019

Greater Media Charlotte, Inc
P.O. Box 65216
Attn: Karen Davis
Charlotte, NC 28265-0216

HRC Rental
P.O. Box 99
Union City, TN 38281-0099

IKON Financial Services
Attn:  Bankruptcy Administration
1738 Bass Road
P.O. Box 13708
Macon, GA  31208-3708

ISP Georgia Sports
Dept 905GEO
POB 667715
Charlotte Nc 28266-7715

Ikon Financial Services
PO Box 740540
Atlanta, GA  30374-0540

Ikon Office Solutions
Recovery & Bankruptcy Group
3920 Arkwright Road, Ste. 400
Macon, GA 31210-1748

Ikon Office Solutions
Southeast District
PO Box 53253030353-2530
Atlanta, GA  30353-2530

Intertech Media
P.O. Box 279
Old Greenwich, CT 06870-0279

Jeff Castle
103 Long Bow Drive
Madison, AL 35758-7859

Jerry Chesser
P.O. Box 18097
Huntsville, AL 35804-8097

Jerry Moore
285 Old Big Cove Road
Brownsboro, AL  35741

John Hancock
POB 7247-0192
Philadelphia PA 19170-0001

John Phillips
15 Noble Woods Way
Ormond Beach, FL 32174-6763

John T. Rogerson, III
Volpe, Bajalia, Wickes, Rogerson & Wachs
EverBank Building, 7th Floor
501 Riverside Avenue
Jacksonville, Florida 32202-4934

Micropower Corporation
PO Box 241730
Little Rock, AR 72223-0014

(c)MOWERKS
1159 HOLLY ST # 100
DAYTONA BEACH FL  32117-4157

N. Florida Street Roda
P.O. Box 60127
Jacksonville, FL 32236-0127

National Registered Agents Inc
PO Box 927
West Windsor, NJ  08550-0927

Official Committee of Unsecured Creditors
c/o Douglas A. Bates, Esq.
200 South Biscayne Blvd., Ste. 1000
Miami, FL 33131-5344

Paetec Communication
P.O. Box 1283
Buffalo, NY  14240-1283

Paul C. Stone
c/o John T. Rogerson, III, Esq.
501 Riverside Ave. 7th Floor
Jacksonville, FL 32202-4934

Pinnacle Towers LLC
P.O. Box 409250
Atlanta, GA  30384-9250

Pitney Bowes
P.O. Box 856460
Louisville, KY 40285-6460

Port Orange Family Days
P.O. Box 290610
Port Orange, FL 32129-0610

Premier Radio Networks, Inc.
P.O. Box 98849
Chicago, IL 60693-8849

Premiere Radio Networks, Inc
P.O. Box 98849
Chicago, IL 60693-8849

Radio Music License Committee
P.O. Box 34655
Newark, NJ 07189-4009

Ray H. Rosenblum
Media Broker/Consultant/Appraiser
P.O. Box 38296
Pittsburgh, PA 15238-8296

Remeisha Shade
196 Jeff Road, #1404
Huntsville, AL 35806-5212

Robert Gray
982 Smokerise Blvd.
Port Orange, FL 32127-7955

SESAC
55 Music Square East
Nashville, TN  37203-4362

Sean Caldwell
185 Rue Des Chateaux
Tarpon Springs, FL 34688-8604

SoundExchange, Inc.
c/o Evelyn J. Meltzer, Esq.
1313 Market Street
P.O. Box 1709
Wilmington, DE  19899-1709

SoundExchange, Inc.
c/o Brad Prendergast, Esq.
1121 Fourteenth St., N.W. Ste. 700
Washington, DC 20005-5619

Stacy Conner
632 Magnolia Lane
Henderson, TN 38340-1258

Stan Carver
100 Savannah Branch
Douglas, GA 31533-9608

Suwannee Valley Electric Corp Inc
PO Box 340
Live Oak, FL 32064-0340

Tennessee Department of Revenue
c/o TN Attorney General's Office
Bankruptcy Division
P O Box  20207
Nashville, TN 37202-4015

Tennessee Titans
Titans Radio Attn: Larry Stone
506 2nd Ave South
Attn: Larry Stone
Nashville, TN 37210-2002

The Lioce Group
2950 Drake Avenue
Huntsville, AL 35805-5124

Titans Radio
506 Second Avenue South
Nashville, TN 37210-2002

Tri-County Electric Cooperative
PO Box 208
Madison, FL  32341-0208

```
WOHL Production                William Morris Talent          Wolfe Communications
15 East 32nd Street            1325 Ave of the Americas        438 East Main Street
6th Floor                      NY NY 10019-6026                Attn: James Wolfe Enterprise
New York, NY 10016-5423                                        Jackson, TN 38301-6328


Wolfe Communications           Wolfe Communications, Inc.
438 East Main Street           c/o James E. Wolfe, Jr.
Jackson, TN 38301-6328         P.O. Box 1686
                               Jackson, TN 38302-1686



              Addresses marked (c) above for the following entity/entities were corrected
                    as required by the USPS Locatable Address Conversion System (LACS).


Mowerks                        End of Label Matrix
1159 Holly St, Ste C           Mailable recipients    94
Daytona Beach, FL  32114       Bypassed recipients     0
                               Total                  94
```